UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH

GERRY R. DICKSON     :
              :
     Plaintiff,    :     Case No. 5:08-CV-8-R
              :
   v.         :
              :
NATIONAL MAINTENANCE &   :
REPAIR OF KENTUCKY, INC.   :
              :
     Defendant.   :

**MEMORANDUM IN SUPPORT OF DEFENDANT'S *DAUBERT*
MOTION TO EXCLUDE PLAINTIFF'S EXPERTS**

**I.  INTRODUCTION**

Defendant National Maintenance & Repair of Kentucky, Inc. ("Defendant" or "National Maintenance") hereby respectfully moves the Court to exclude Plaintiff Gerry Dickson's ("Plaintiff" or "Dickson") expert witnesses. Plaintiff has identified four experts regarding the alleged cause of his multiple myeloma: Kenneth Rudo, Ph.D. (toxicologist), Myron Mehlman, Ph.D. (environmental toxicologist), Roger Wabeke (chemical safety engineer, industrial hygienist, and toxicologist), and Nachman Brautbar, M.D. (internal medicine). Plaintiff's experts' opinions, however, are not supported by the evidence and can only be classified as subjective belief and unsupported speculation resulting in conclusory opinions. Plaintiff's experts fail to use accepted scientific methodology and blindly ignore the scientific literature in order to arrive at their opinions. They also rely upon one-another's opinions as support for their own, rendering the entire foundation of their opinions illusory. These collective failings render Plaintiff's experts' theories and conclusions utterly unreliable, warranting their exclusion from the case.

The fundamental issue in this litigation, as in all toxic tort personal injury cases, is medical causation, that is, whether the plaintiff can carry his burden of proof, through competent expert testimony, that the alleged toxin at issue (diesel exhaust) was in fact the cause of his injury (multiple myeloma).  Before a fact finder is presented with the competing evidence on the point, the scientific evidence must first pass muster with the Court under the dictates of *Daubert* and its progeny.

## II.      STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY

### A.      ADMISSIBILITY OF SCIENTIFIC EXPERT TESTIMONY UNDER EVIDENCE RULE 702 AND *DAUBERT*

The admissibility of expert witness testimony is governed by Evidence Rules 104(a) and 702, applied under the rubric established by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999).

In addressing Rule 702, the *Daubert* Court set forth a standard for the admissibility of scientific expert testimony to be applied by trial courts.  The Court explained that the use of the word "scientific" in Rule 702 "implies a grounding in the methods and procedures of science" and the use of the word "knowledge" connotes "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590.  Thus, the Court concluded:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation - *i.e.*, "good grounds," based on what is known.  In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id*.  In short, a trial court judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being speculation offered by a genuine scientist. *Tamraz v. Lincoln Elec., Co.*, 620 F.3d 665, 677 (6th Cir. 2010)(citing *Rosen v. Ciba-Geigy Corp.*,

78 F.3d 316, 318 (7th Cir. 1996)).

In essence, *Daubert* imposes a "gatekeeping" role on trial judges which, in turn, triggers a two-part analysis. First, the trial court must determine whether the proffered testimony is reliable. That determination encompasses an assessment of whether the reasoning or methodology on which the testimony is based is scientifically valid. *Daubert*, 509 U.S. at 592. The factors identified by the Supreme Court as relevant to this inquiry include:

> (1) whether the theory can be (and has been) tested according to the scientific method;
>
> (2) whether the theory or technique has been subjected to peer review and publication;
>
> (3) in the case of a particular scientific technique, the known or potential rate of error; and
>
> (4) whether the theory is generally accepted.

*Id*. at 593-94. If the proffered testimony meets the first prong of the analysis, the trial judge must then decide whether the testimony meets the second prong of the analysis – relevance; whether that reasoning or methodology can be applied to the facts at issue. In other words, whether it is relevant to the case at hand. *Id*. at 592-93.

This preliminary fact-finding assessment of the expert's reasoning or methodology, and the application of the *Daubert* factors, is required not only in cases of "hard science," but also when the case involves questions of medical causation. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 275 n. 6 (5th Cir. 1998). Thus, the party seeking to admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. *In re Ingram Barge Co.*, 187 F.R.D. 262, 264 (M.D. La. 1999). This requires some objective,

independent validation of the expert's methodology.  *Id*.  Expert opinions based upon nothing more than the logical fallacy of *post hoc ergo propter hoc* typically do not pass muster under *Daubert*. *Rolen v. Hansen Beverage Co.*, 193 Fed. Appx. 468, 473 (6th Cir. 2006).

**B.    ADMISSIBILITY OF EXPERT TESTIMONY IN TOXIC TORT CASES**

In toxic tort cases, the causation inquiry is two-pronged.  First, a plaintiff must show that the substance to which he was exposed *can cause* the type of injury alleged – general causation.  Next, a plaintiff must show that in his case, exposure to the substance *actually caused* the alleged injury – specific causation.  *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 874 (S.D. Ohio 2010).

**1.    General Causation**

General causation focuses on evidence that the substance at issue is capable of causing the injury alleged by the plaintiff.  *McClain v. Metabolife International, Inc.,* 401 F.3d 1233, 1239 (11th Cir. 2005).  It is proven by demonstrating, often through the medical and scientific literature, that exposure to a substance can cause a particular disease.  The relevant scientific field for determining general causation is epidemiology or toxicology.  *Siharath v. Sandoz Pharmaceuticals Corp.*, 131 F. Supp. 2d 1347, 1363 (N.D. Ga. 2001).

In short, when assessing whether an individual's disease (multiple myeloma) was caused by exposure to some agent or substance (diesel exhaust), the first step is to ask whether the agent or substance is a known cause of that disease.  If the agent or substance is not known to cause that disease, then it cannot reasonably be concluded to be the cause of any particular individual's disease, regardless of the circumstances of his exposure to the agent or substance.

## 2.      Specific Causation

Specific causation, on the other hand, focuses on plaintiff-specific questions.  Experts must determine whether the plaintiff was exposed to the toxin that allegedly caused his injury, whether the plaintiff received a dose of the toxin in an amount sufficient to cause injury, and whether the received dose was a substantial factor in causing the injury.  *McClain*, 401 F.3d at 1239; *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *Wintz by and through Wintz v. Northrop Corp.*, 110 F.3d 508, 513 (7th Cir. 1997); *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case.").

Experts often attempt to establish specific causation by conducting what is known as a "differential etiology" or "differential diagnosis."  Differential diagnosis is "[t]he method by which a physician determines what disease process caused a patient's symptoms.  The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history."  *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001)(quoting Federal Judicial Center, Reference Manual on Scientific Evidence 214 (1994)).  Specifically, a medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor: 1) objectively ascertains, to the extent possible, the nature of the patient's injury; 2) "rules in" one or more causes of the injury using a valid methodology; and 3) performs standard diagnostic techniques by which doctors normally rule out alternative causes to reach a conclusion as to which cause is most likely.  *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009).  In connection with the third prong, if the doctor

-5-

performs very few standard diagnostic techniques by which doctors normally rule out alternative causes, the expert must offer a good explanation as to why his conclusion is reliable. *Id*. Similarly, the doctor must provide a reasonable explanation as to why he has concluded that alternative causes suggested by the defense were not the sole cause. *Id*.

Claiming the expert performed a differential diagnosis "is not some incantation that opens the *Daubert* gate." *Tamraz*, 620 F.3d at 674. Conducting a differential diagnosis does not, by itself, answer the reliability question, but prompts three more: 1) Did the expert make an accurate diagnosis of the nature of the disease? 2) Did the expert reliably rule in the possible causes of it? and 3) Did the expert reliably rule out the rejected causes? *Id*. If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached. *Id*. Thus, not every opinion that is reached via differential diagnosis will meet the standard of reliability required by *Daubert*. *Rolen*, 193 Fed. Appx. at 474 n. 4.

## III.    FACTUAL BACKGROUND

Before discussing the opinions expressed by Plaintiff's experts, a brief discussion of the background of the case is warranted. Beginning in December 2001, Dickson was the pilot of the M/V E.W. Thompson, an inland river towing vessel operated by his employer, National Maintenance. (Doc. 1, Complaint, ¶ 5). Plaintiff asserts that during his assignment as pilot, he was exposed to dangerous amounts of diesel exhaust in the pilothouse due to the "defective" exhaust system. (Doc. 1, Complaint, ¶ 6). The exhaust stacks were reconfigured in August or September of 2004. (Exhibit A, McDaniel depo., p. 15). In August 2005, Plaintiff was diagnosed with multiple myeloma. (Doc. 1, Complaint, ¶¶ 7-8).

Multiple myeloma is cancer of plasma cells. (Exhibit B, Gerr Decl., ¶ 3). As a cancer of the

blood system, multiple myeloma is one of many hematologic cancers.  (Exhibit B, Gerr Decl., ¶ 3).

Leukemia and lymphomas are also hematopoeitic cancers, although they are distinct malignancies

from multiple myeloma.  (Exhibit B, Gerr Decl., ¶ 3).

     Medical science recognizes that multiple myeloma is an "idiopathic" cancer; that is, medical

science has not identified any known cause.  (Exhibit B, Gerr Decl., ¶ 4).  In other words, the cause

of multiple myeloma is unknown; a fact that Plaintiff's own experts are forced to concede.  More

specifically, no study, review or medical textbook has concluded that exposure to diesel exhaust can

actually cause multiple myeloma.   (Exhibit B, Gerr Decl., ¶ 5).  Likewise, several major

environmental and public health agencies have studied the effects of diesel exhaust on health,

including the EPA, U.S. National Toxicology Program, and the International Agency for Research

on Cancer, and do not associate multiple myeloma with exposure to diesel exhaust.  (Exhibit B, Gerr

Decl., ¶ 6).

     In assessing the medical literature cited by the experts in this case, it is important to

understand the meaningful distinction between the terms "association" and "causation."  While they

are related concepts, they are not interchangeable and the distinction is essential.  Epidemiologically,

an association is a necessary, but not sufficient, condition for causation.  (Exhibit B, Gerr Decl., ¶

7).  Therefore, finding an association between an agent and a disease, while also finding there to be

no known cause for the same disease, is not internally inconsistent.  (Exhibit B, Gerr Decl., ¶ 7).

     An association between an exposure and an adverse health condition occurs when the adverse

health condition is more common or more severe among those who have experienced the exposure

than it is among those who have not experienced the exposure.  (Exhibit B, Gerr Decl., ¶ 8).

Association is a necessary condition for causation, but it is not, itself, proof of causation.  (Exhibit B, Gerr Decl., ¶ 8).

For example, if we were to segregate people who are heavy drinkers of whiskey from people who drink no whiskey, we would observe (at least in the United States) that smoking is more common among the heavy drinkers than among the non-drinkers.  This would lead to the observation of an association between whiskey drinking and lung cancer.  The association is real (or true), but it is not causal.  The association between whiskey drinking and lung cancer would be due to the fact that the whiskey drinkers were more likely to be smokers, not because whiskey, itself, causes lung cancer.  In this example, one way to test whether the association between whiskey drinking and lung cancer is causal is to, in some way, prevent whiskey drinking, but make no change to smoking.  If smoking continued in the absence of whiskey drinking, no reduction in lung cancer would be observed.  The converse is not true.  If smoking were eliminated, but whiskey drinking continued without change, then nearly all lung cancer would vanish.  The whiskey was associated with lung cancer, but was not causing it.  The smoking was also associated with lung cancer and was causing it.  (Exhibit B, Gerr Decl., ¶ 9).

Non-casual associations such as the above example are seen in the medical literature as a result of statistical chance, as well as confounding – mixing of exposures.  (Exhibit B, Gerr Decl., ¶ 10).  This explains why, in epidemiological science, no one study is considered proof of causation.  (Exhibit B, Gerr Decl., ¶ 10).  Rather, consistency across the whole body of literature is considered necessary for an association to be considered causal, rather than non-casual.  (Exhibit B, Gerr Decl., ¶ 10).

## IV.   PLAINTIFF'S EXPERTS' OPINIONS

### A.   <u>KENNETH RUDO, Ph.D.</u>

Dr. Kenneth Rudo ("Rudo") is Plaintiff's toxicology expert.  Citing his review of "peer reviewed toxicological literature" and his discussions with Dickson, Rudo ultimately opines that Dickson's "significant" exposure to diesel exhaust for a period of approximately 30-36 months "more likely than not <u>is linked</u> to the multiple myeloma."  (Exhibit C, Rudo report, p. 1).  Rudo explained that the term "linked" is synonymous with an "increased association."  (Exhibit D, Rudo depo., p. 55).  Rudo clarified at his deposition that he is not in a position to offer an opinion on medical causation.  (Exhibit D, Rudo depo., pp. 30, 56).

Rudo claims that several peer reviewed studies, which are not specifically identified, indicate that diesel exhaust can cause cancer – although what type of cancer remains a mystery.  (Exhibit C, Rudo report, pp. 1-2).  Additional peer reviewed studies allegedly show diesel exhaust exposure may result in an <u>increased association</u> to multiple myeloma.[1]  (Exhibit C, Rudo report, p. 2; Exhibit D, Rudo depo., pp. 69-70, Ex. 13-18).  Further, some of these studies allegedly show that exposure to benzene – a component of diesel exhaust – has also been shown to result in an <u>increased association</u> to multiple myeloma in humans.[2]  (Exhibit C, Rudo report, p. 2).  Rudo concedes, however, there are also studies in authoritative, peer reviewed publications that conclude there is <u>no association</u> between exposure to diesel exhaust and multiple myeloma.  (Exhibit D, Rudo depo., pp. 66, 68, 124).  In fact, the majority of the studies on the issue have not found any statistically meaningful

---

[1] Nilsson RI et al., Occup. Environ. Med., 55(8) : 517-521, 1998; Lee WJ., Int. J. Cancer, 107(1) : 134-138, 2003; Bofetta P., et al., Int. J. Cancer, 43(4) : 554-559, 1989; Eriksson M., et al., Br. J. Ind. Med., 49(2) : 95-103, 1992; Kirkeleit J., et al., Cancer Causes Control 19(1) : 13-23, 2007; Flodin U., et al., Am. J. Ind. Med., 12(5) : 519-529, 1987.

[2] Rudo has never specifically identified which studies show this alleged increased association.

relationship between diesel exhaust and multiple myeloma.  (Exhibit B, Gerr Decl., ¶¶ 4, 5).  Thus, Rudo is relying exclusively on an unrepresentative minority of the literature to support an idiosyncratic opinion.  Furthermore, no study has concluded that diesel exhaust, or benzene for that matter, <u>actually causes</u> multiple myeloma.  (Exhibit D, Rudo depo., pp. 60-61, 64-65).

One of the basic tenets of toxicology is that dose makes the poison.  In order for there to be a link between a toxic substance and cancer, there must be exposure to a sufficient dose over a sufficient time period.  (Exhibit D, Rudo depo., p. 80).  Even assuming, *arguendo*, that diesel exhaust can cause multiple myeloma, which it does not, Rudo has not identified, or even attempted to estimate, the actual dose of diesel exhaust to which Dickson was allegedly exposed.  (Exhibit D, Rudo depo., p. 75).  Nor has he done any testing to determine what Dickson's exposure to benzene might be from diesel exhaust.  (Exhibit D, Rudo depo., p. 100).  The absolute most he can say is that the toxins in diesel exhaust would be found in the parts per million, although this estimation is based on anecdotal information, not published peer reviewed literature.  (Exhibit D, Rudo depo., pp. 87, 102).  Furthermore, the concentrations of the various components of diesel exhaust vary over time by virtue of changes in formulations, thereby altering the composition of agents found in diesel exhaust.  (Exhibit D, Rudo depo., p. 96).  He has not conducted any experiment or testing, nor has he reviewed any testing, in an attempt to quantify the actual level of any toxin present in Dickson's work environment, which also would have been variable depending on whether the pilothouse windows and door were open or closed.  (Exhibit D, Rudo depo., pp. 31, 77, 111).

Further, Rudo acknowledges that the studies on which he is relying do not specify at what dose and duration there is an increased association between exposure to diesel exhaust and multiple myeloma.  (Exhibit D, Rudo depo., pp. 104, 106).  Thus, Rudo has not identified the dose of

Dickson's exposure to diesel exhaust, much less the dose at which the alleged association between diesel exhaust and multiple myeloma is supposedly found.  (Exhibit D, Rudo depo., pp. 74-75, 106).  For this reason, Rudo is unable to reliably apply the findings of the studies showing an increased association to Dickson's alleged exposure to diesel exhaust.  (Exhibit D, Rudo depo., pp. 83-84).

Nevertheless, Rudo states Dickson's exposure to diesel exhaust was "well above the normal exposure," although he does not define "normal exposure" and testified at deposition that he is unable to compare the two levels of exposure – normal versus "well above" – on a quantitative level. (Exhibit C, Rudo report, p. 1; Exhibit D, Rudo depo., p. 121).  The only "evidence" Rudo cites for this proposition, however, is Dickson's self-report of soot in the pilothouse.  (Exhibit C, Rudo report, p. 1; Exhibit D, Rudo depo., pp. 111-112).  Setting aside the contrary testimony on this point and the lack of information regarding the time period over which soot allegedly accumulated, this finding is nothing more than baseless speculation as evidenced by the complete lack of citation to any study or testing quantifying the amount of diesel exhaust necessary to result in soot residue, which can then be compared to the "normal exposure" levels.

Rudo also acknowledges that everyone is exposed to benzene on a daily basis.  (Exhibit D, Rudo depo., p. 90).  For instance, benzene is one of the toxins Dickson would have been exposed to through cigarette smoking and Rudo acknowledges Dickson was a cigarette smoker for a number of years.  (Exhibit C, Rudo report, p. 2; Exhibit D, Rudo depo., p. 92).  However, without discussing the extent and duration of Dickson's smoking habit or identifying the various additional carcinogens contained in cigarettes, Rudo states that studies have shown cigarette smoke is not associated with multiple myeloma in humans and therefore dismisses its role in the causation analysis.  (Exhibit C, Rudo report, p. 2; Exhibit D, Rudo depo., p. 114).  While this is true, this conclusion highlights

-11-

Rudo's hypocrisy – that benzene in diesel exhaust is linked to the development of multiple myeloma, but benzene in cigarettes is not. This type of "logic" can hardly be characterized as reliable scientific analysis and should not be permitted.

**B.    MYRON MEHLMAN, Ph.D.**

Myron Mehlman, Ph.D. ("Mehlman") is Plaintiff's environmental toxicology expert. In reaching his opinions in this case, Mehlman primarily relied on the reports of Plaintiff's other experts – Rudo and Brautbar. (Exhibit E, Mehlman report, p. 6; Exhibit F, Mehlman depo., pp. 11-12). Mehlman has never actually spoken with Dickson. (Exhibit F, Mehlman depo., p. 12). Mehlman's opinion in this case is that "Dickson's exposure to diesel exhaust and chemical products more likely than not caused his multiple myeloma." (Exhibit E, Mehlman report, p. 2). It should be noted that at no time does Mehlman identify the "chemical products" to which he refers, instead focusing exclusively on Dickson's exposure to benzene as a component of diesel exhaust.

By virtue of his reliance on Rudo and Brautbar, Mehlman reached his opinion in this case without any information or data concerning the actual dose of Dickson's exposure to diesel exhaust or benzene in the pilothouse. (Exhibit F, Mehlman depo., pp. 13-14, 65). Further, no modeling has been conducted in an attempt to remedy this lack of information. (Exhibit F, Mehlman depo., pp. 14, 65). Mehlman has made no effort to ascertain the PPM-year dosage of benzene Dickson experienced due to his alleged occupational exposure to diesel exhaust. (Exhibit F, Mehlman depo., pp. 45, 71). In addition, Mehlman was unable to cite a single publication in the scientific literature that identified a threshold dose of diesel exhaust above which it has been scientifically proven that an individual is expected to develop multiple myeloma. (Exhibit F, Mehlman depo., p. 48). Nor

could Mehlman recall the dosage of benzene at which systemic effects would be expected, stating it was not important for his analysis of this case.  (Exhibit F, Mehlman depo., pp. 51-52).

Based on the foregoing, there is no basis for Mehlman to conclude that Dickson was occupationally exposed to toxicologically significant amounts of diesel exhaust and/or benzene. Since the first law of toxicology is that "dose makes the poison," Mehlman's opinion is terminally flawed.  Without a scientifically credible estimate of dose, it is not possible for Mehlman to conclude with any reasonable level of scientific or medical certainty that diesel exhaust or benzene caused Dickson's multiple myeloma.

Furthermore, assuming for the sake of argument that benzene could cause multiple myeloma, Mehlman concedes that benzene is not the cause of every case of multiple myeloma.  (Exhibit F, Mehlman depo., p. 53).  Mehlman claims he performed a differential diagnosis in this case, yet there is absolutely no discussion of his alleged consideration and ruling out of possible alternate causes of Dickson's multiple myeloma, including non-occupational exposures to benzene or the fact that multiple myeloma is an idiopathic disease.  (Exhibit F, Mehlman depo., pp. 15-16).  This is especially surprising, given that benzene occurs naturally, that everyone is exposed to benzene throughout their lifetime, and the largest exposure to benzene is through cigarette smoke.  (Exhibit F, Mehlman depo., pp. 50, 53).  Despite these inevitabilities, Mehlman took no action to determine the dose of Dickson's benzene exposure from smoking or other non-occupational sources, only stating – without quantitative proof – that it is less than the level of exposure from diesel exhaust. (Exhibit F, Mehlman depo., pp. 45, 56-57, 69, 101-102).

If Mehlman believes that Dickson's exposure to benzene caused his multiple myeloma, it would only be logical for him to identify all possible sources and doses of benzene exposure and

provide a scientific explanation for why his non-occupational exposures were not the cause of his multiple myeloma and his occupational exposure was the cause.  He has not done this.  (Exhibit F, Mehlman depo., pp. 51, 56-57, 84).  Thus, he cannot tell the Court one way or the other whether Dickson's exposure to benzene from smoking was sufficient to cause his multiple myeloma, just as he is unable to differentiate between Dickson's exposure to benzene from diesel exhaust and his exposure from smoking.  (Exhibit F, Mehlman depo., pp. 81, 84).  Nevertheless, Mehlman goes on to opine that benzene exposure from smoking did not cause Dickson's cancer.  (Exhibit F, Mehlman depo., pp. 84-85).

In discussing general causation, Mehlman claims the "gold standard" for identification of chemical carcinogens is long-term, chronic animal bioassays.  (Exhibit E, Mehlman report, p. 7).  Based on these types of studies, Mehlman asserts that benzene has been demonstrated to cause tumors in rats, including a variety of cancers.  (Exhibit E, Mehlman report, p. 10).  Mehlman then references several studies, which he interprets as establishing a "significant risk" of multiple myeloma in workers exposed to benzene and engine exhaust.  (Exhibit E, Mehlman report, p. 21).  However, only some of the studies on which Mehlman relies specify dose.  (Exhibit F, Mehlman depo., p. 77).  Further, by relying on animal bioassay studies, Mehlman blurs the line between suspicion that an agent can cause cancer and proof that it does cause cancer in humans.  This is evidenced by the International Agency for Research on Cancer's statement that when carcinogenicity in experimental animals is determined, it should be treated "as if they presented" a carcinogenic risk to humans.  (Exhibit E, Mehlman report, p. 9).  "As if they presented" is not synonymous with "as proof of."

In his expert report, Dr. Mehlman provided a table (from Infante, 2006) entitled "Summary of estimates of relative risk of [multiple] myeloma identified in benzene cohort studies selected for inclusion in analysis by author and year of publication." (Exhibit E, Mehlman report, p. 19, Table 5). There is no discussion or explanation relating to how the seven studies were selected for inclusion in the table. More importantly, however, six of the seven studies fail to show a statistically significant increase in the risk of multiple myeloma. (Exhibit B, Gerr Decl., ¶ 11).

Mehlman also references Prof. Bernard D. Goldstein, "one of the most knowledgeable hematologists in the world on the subject of benzene and blood diseases," who concedes that *the etiology of multiple myeloma is not known*, although Goldstein can make "some arguments that benzene could be a contributing cause of multiple myeloma." (Exhibit E, Mehlman report, p. 17). Simply put, arguments in support of causation cannot carry the burden of proof on general causation.

Finally, and most importantly, diesel exhaust is not a known cause of multiple myeloma. Mehlman provides no countervailing medical or scientific evidence on this point. Rather, he claims that due to the fact that diesel exhaust contains some benzene, it is his opinion that diesel exhaust "relates" to the development of all lymphoreticular hemopoietic tumors. (Exhibit F, Mehlman depo., pp. 33-34, 53). This broad sweeping speculation is not accompanied by citation to scientific literature and completely ignores the fact that each hematologic cancer is distinct. Mehlman's opinion in this regard is not grounded in scientific methods, is scientifically invalid, and is unreliable.

## C.   ROGER WABEKE

Roger Wabeke ("Wabeke") is a chemical safety engineer, industrial hygienist, and an occupational, environmental and applications toxicologist. (Exhibit G, Wabeke report, p. 1). In

reaching his opinions in this case, Wabeke did not review scientific literature regarding cancer and exposure to diesel exhaust or benzene. (Exhibit G, Wabeke report, p. 4). More specifically, he was not asked to testify concerning whether the literature recognizes a link between diesel exhaust and multiple myeloma. (Exhibit H, Wabeke depo., pp. 16, 61). Wabeke is not a medical doctor and is unable to provide medical opinions. (Exhibit H, Wabeke depo., p. 29).

According to Wabeke, three human carcinogenic chemicals are present in diesel exhaust, including benzene. (Exhibit G, Wabeke report, p. 3). Benzene is allegedly "recognized" as a lymphohematopoietic carcinogen. (Exhibit G, Wabeke report, p. 3). This recognition is inapposite, however, as the fact that benzene may cause leukemia does not mean it causes all cancers, including multiple myeloma.

Dickson reported experiencing headaches and fatigue, which Wabeke describes as symptoms suggesting exposure to carbon monoxide gas and leading Wabeke to speculate that "all other diesel emissions" must have intruded the pilothouse as well. (Exhibit G, Wabeke report, p. 2). However, no testing has been performed to ascertain the amount of benzene in the diesel exhaust aboard the M/V E.W. Thompson. (Exhibit H, Wabeke depo., p. 83). Moreover, Wabeke has not reviewed any medical records to confirm that Dickson's alleged symptoms chronologically correspond with his complaints concerning his work environment. (Exhibit H, Wabeke depo., pp. 73-74). In fact, Dickson's medical records actually refute this through reference to Dickson's own testing, which found normal carbon monoxide levels in the pilothouse. (Exhibit K, Brautbar depo., Ex. 7).

Nevertheless, Wabeke states that throughout Dickson's employment with National Maintenance, he had regular, chronic, and frequent inhalation exposures to these air toxicants, which he describes as excessive. (Exhibit G, Wabeke report, pp. 4, 5; Exhibit H, Wabeke depo., p. 64).

-16-

He bases this conclusion exclusively on Dickson's subjective statement that he noticed and inhaled diesel exhaust in the pilothouse. (Exhibit G, Wabeke report, pp. 2, 5; Exhibit H, Wabeke depo., p. 121). However, he has no opinion concerning the precise time frame during which the alleged excessive exposure occurred. (Exhibit H, Wabeke depo., p. 82). He also acknowledges that the concentration of diesel exhaust in the pilothouse would be variable. (Exhibit H, Wabeke depo., pp. 76, 86, 91).

Each of Wabeke's opinions were reached without the benefit of any testing or other empirical data quantifying the dose of any potential toxic air contaminants. (Exhibit G, Wabeke report, p. 3; Exhibit H, Wabeke depo., p. 33). Wabeke has not calculated the precise dosage of diesel exhaust, or benzene, to which Dickson was allegedly exposed in the pilothouse. (Exhibit H, Wabeke depo., pp. 33, 62-63, 121). Nor has he done any modeling to determine same. (Exhibit H, Wabeke depo., p. 63). However, relying solely on his personal experience in taking air samples of diesel exhaust emissions at Ford in the 1970s, Wabeke claims the level of benzene exposure in the pilothouse would have been in the range of 2-13 parts per million. (Exhibit H, Wabeke depo., pp. 99-100).

In his attempt to extrapolate this information from 40 years ago and apply it to this case, Wabeke does not address whether diesel fuel involved was the same formula as that used aboard the M/V E.W. Thompson or how the Ford engines compare to the engines and related combustion process aboard the M/V E.W. Thompson during Dickson's employment, rendering his opinion concerning estimated exposure levels highly unreliable.

### D.   DR. NACHMAN BRAUTBAR

Dr. Nachman Brautbar ("Brautbar") is Plaintiff's medical expert. Relying exclusively on Rudo, Brautbar states Dickson was "significantly exposed" to diesel exhaust, in excess of "normal

exposure," for 30-36 months.  (Exhibit I, Brautbar 2/17/09 report, p. 2; Exhibit J, Brautbar 7/21/09 report, p. 8).  Based on this exposure, Brautbar opines that Dickson's exposure to petroleum products containing benzene at National Maintenance constituted a toxic exposure that caused his multiple myeloma.  (Exhibit K, Brautbar depo., pp. 35, 46, 66).

Brautbar explains that diesel exhaust is composed of several carcinogenic agents, including benzene.  (Exhibit I, Brautbar 2/17/09 report, p. 3).  Brautbar then reviews literature discussing the relationship between benzene and leukemia, stating that no scientific study has established a threshold limit for benzene exposure below which leukemia cannot occur.  (Exhibit I, Brautbar 2/17/09 report, pp. 7-8).  However, leukemia is a distinct malignancy from multiple myeloma and Dickson does not have leukemia, rendering his discussion on this point superfluous.  (Exhibit B, Gerr Decl., ¶ 3).  Adding to this red herring discussion, Brautbar then cites to an EPA policy statement for the proposition that health hazards associated with exposure to known carcinogens must be considered to pose some finite risk of cancer at any exposure level above zero.  (Exhibit I, Brautbar 2/17/09 report, p. 8).  While this may be true in the abstract, policy statements are not scientific proof and, even if it was, such a broad sweeping statement falls well short of satisfying the burden of proof on general causation with respect to diesel exhaust and multiple myeloma.

In August 2005, Dickson was diagnosed with multiple myeloma.  (Exhibit I, Brautbar 2/17/09 report, p. 2).  Multiple myeloma is cancer of plasma cells and is incurable.  (Exhibit I, Brautbar 2/17/09 report, pp. 3-4).  Instead of focusing on whether diesel exhaust has been shown to cause multiple myeloma, Brautbar focuses his analysis on the role of benzene – an unquantified component of diesel exhaust.  Brautbar acknowledges that "[m]any epidemiologic studies of benzene-exposed workers have been conducted and published.  However, because of the rarity of

multiple myeloma, *few of the studies have had a sufficient statistical power to detect statistically significant increases in multiple myeloma*." (Exhibit I, Brautbar 2/17/09 report, p. 10)(emphasis added). Ignoring this fact, Brautbar discusses a few studies of benzene-exposed workers that have reported an <u>increased risk</u> of multiple myeloma, as well as a number of studies with results that were not statistically significant. (Exhibit I, Brautbar 2/17/09 report, pp. 10-14). It is imperative to note, however, that none of the studies cited by Brautbar prove that benzene <u>actually causes</u> multiple myeloma. Moreover, Brautbar admits there are "a number of studies" that reach the opposite conclusion, i.e. that no causal nexus exists. (Exhibit I, Brautbar 2/17/09 report, p. 15; Exhibit J, Brautbar 7/21/09 report, p. 8). Nevertheless, Brautbar concludes that the existence of an <u>association</u> between benzene and multiple myeloma is "probably genuine." (Exhibit I, Brautbar 2/17/09 report, p. 15). He explains this conclusion is supported by causal associations between benzene "and other hematolymphopoietic malignancies" and "biological plausibility." (Exhibit I, Brautbar 2/17/09 report, p. 15; Exhibit K, Brautbar depo., p. 85). In short, his causation conclusion is premised upon unsupported speculation.

At deposition, Brautbar was questioned specifically about the relationship between diesel exhaust and multiple myeloma. Brautbar admits there are no medical or toxicology textbooks that report a known, scientifically-proven causal connection between exposure to diesel exhaust and multiple myeloma. (Exhibit K, Brautbar depo., p. 9). Brautbar has located only 2-3 studies that have found an <u>association</u> between diesel exhaust and multiple myeloma, conceding that the majority of studies on the topic did not find any association to exist. (Exhibit K, Brautbar depo., pp. 66, 111). In fact, these handful of studies are vastly outnumbered by the studies in which no association was

found.[3]  Regardless, it should be understood that even when an association is found to exist, that is not the equivalent of finding a casual connection.  (Exhibit K, Brautbar depo., p. 69).  Thus, Brautbar's reference to a few studies reporting an association between diesel exhaust and multiple myeloma is insufficient evidence of causation and clearly dispels any claim that diesel exhaust causes multiple myeloma is generally accepted.

One study Brautbar relies on is Flodin's 1987 paper showing an "increase" in multiple myeloma in those exposed to engine exhaust.  (Exhibit K, Brautbar depo., pp. 12, 14).   Brautbar could not explain whether there is a difference between engine exhaust and diesel exhaust and, more importantly, concedes that Flodin does not conclude that diesel exhaust actually causes multiple myeloma.  (Exhibit K, Brautbar depo., pp. 13, 17).  It should also be noted that Flodin's study used a five year latency period, which is almost twice as long as Dickson's alleged 30-36 month exposure.  (Exhibit K, Brautbar depo., p. 26).

In addressing the issue of latency – the period of time from first exposure to the onset of the disease – Brautbar cites Infante's study for finding that latency may range from less than one year to 40 years after the initial exposure.  (Exhibit J, Brautbar 7/21/09 report, p. 12).  However, Infante's study was examining the link between benzene and leukemia.  (Exhibit J, Brautbar 7/21/09 report,

---

[3]  Wong O. Is there a causal relationship between exposure to diesel exhaust and multiple myeloma? *Toxicology Review* 22:91-102; 2003 (review of the medical literature found 18 of 20 studies found no association between diesel exhaust and multiple myeloma); Alexander DD, Mink PJ, Adami H-O, Cole P, Mandel J., Oken MM, Trichopoulos D. Multiple myeloma: A review of the epidemiological literature. *International Journal of Cancer*. 120:40-61; 2007 (Authors of this major review noted that "Several cohort, case-control, and proportionate mortality studies have found no significant association of risk of multiple myeloma with exposure to diesel exhaust and/or engine exhaust, or occupations with potential for such exposure." They cited 12 published studies in support of this statement.); Kyle RA, Rajkumar SV. Epidemiology of the plasma cell disorders. *Best Practice and Research Clinical Haematology*. 20:637-644; 2007 (The authors reviewed 152 studies and bluntly concluded: "The cause of multiple myeloma is unclear." While they noted that exposure to radiation, herbicides, insecticides, benzene and other organic solvents "may play a role" in the cause of multiple myeloma, they concluded that "evidence suggesting benzene, petroleum products, and engine exhaust cause multiple myeloma is weak.").

p. 10, Ex. P). Once again, leukemia is a distinct malignancy from multiple myeloma and, more importantly, Dickson does not have leukemia. Thus, Brautbar's reliance on Infante's study in this regard is misguided. Similarly, Brautbar cites Kirkeleit, et al. [2008], which reviews the relationship between benzene exposure and human hematopoieses (i.e., formation of blood cells), not multiple myeloma. (Exhibit J, Brautbar 7/21/09 report, pp. 10-11, Ex. Q). Regardless, this is a hypothetical discussion point, as diesel exhaust is not known to cause multiple myeloma.

Like each of Plaintiff's other experts, Brautbar has rendered his opinions in this case without knowing the actual dose of Dickson's exposure to diesel exhaust or benzene from diesel exhaust. (Exhibit K, Brautbar depo., pp. 31, 64, 108). Relying on an undocumented discussion with Wabeke, Brautbar states the dose of Dickson's exposure to diesel exhaust was in the parts per million, although what level in parts per million remains a mystery. (Exhibit K, Brautbar depo., pp. 30, 39-40). This estimate is presumably based on Wabeke's experience and discussions with Dickson, not on scientific testing. (Exhibit K, Brautbar depo., pp. 40, 50). Brautbar claims, however, that the precise exposure level is not necessary, instead relying on the mere presence of a temporal relationship between "substantial" exposure and diagnosis. (Exhibit J, Brautbar 7/21/09 report, p. 13).

Instead, Brautbar claims to have extrapolated the fact that Dickson was exposed to diesel exhaust in the tens and hundreds of parts per million by virtue of Dickson's reports in 2002 of headaches, dizziness, and changes in vision. (Exhibit K, Brautbar depo., pp. 31-33). In making this statement, Brautbar relies on Patty's textbook, *Industrial Hygiene or Toxicology*. (Exhibit K, Brautbar depo., p. 33). Yet, when presented with Dickson's August 2002 medical record, Brautbar confessed there was no reference to diesel exhaust in the medical history. (Exhibit K, Brautbar

-21-

depo., p. 60).  Furthermore, the usefulness of Brautbar's extrapolation would be limited only to those days where Dickson experienced these symptoms, which has never been made part of the record.  (Exhibit K, Brautbar depo., pp. 120-121).  Moreover, Brautbar states that if there was substantial exposure to diesel exhaust in the pilothouse, carbon monoxide levels would also be elevated.  (Exhibit K, Brautbar depo., p. 54).  However, as noted in the August 2002 office note, Dickson took a carbon monoxide monitor to work and found no elevation in the carbon monoxide levels in the pilothouse and there is no indication in the medical records that Dickson was ever diagnosed with carbon monoxide poisoning. (Exhibit K, Brautbar depo., p. 64, Ex. 7).

Brautbar admits he is unaware of any peer reviewed publication in the medical literature that quantifies the dose of diesel exhaust necessary in order for multiple myeloma to develop.  (Exhibit K, Brautbar depo., pp. 129-130).  Therefore, even assuming, *arguendo*, that Dickson was exposed to diesel exhaust in the parts per million range, there remains no scientific evidence that this is sufficient to cause multiple myeloma.

Turning to specific causation, Brautbar claims to have performed a differential diagnosis.  (Exhibit I, Brautbar 2/17/09 report, p. 16).  In doing so, Brautbar ruled out radiation exposure, heavy pesticide exposure, heavy metal exposure, and creosote exposure as possible causes.  (Exhibit I, Brautbar 2/17/09 report, p. 16).  In addition, Brautbar states he has accounted for Dickson's smoking history.  (Exhibit I, Brautbar 2/17/09 report, p. 16; Exhibit J, Brautbar 7/21/09 report, p. 10).  However, he has inconsistently characterized the level of Dickson's exposure to benzene from cigarettes.  In his July 21, 2009 report, he states benzene from smoking would be in the range of 12-

-22-

15 parts per billion-year.[4]  (Exhibit J, Brautbar 7/21/09 report, p. 10, Ex. O).  Yet at deposition, he initially estimated the dose to be 20 parts per billion-year, but later estimated the dose to be in the parts per million.  (Exhibit K, Brautbar depo., pp. 37, 46).  Despite these varying figures, Brautbar concludes that Dickson's cigarette smoking was a substantial contributing factor in causing his multiple myeloma, but minor in comparison to his occupational exposure.  (Exhibit J, Brautbar 7/21/09 report, pp. 10, 14; Exhibit K, Brautbar depo., p. 115).

Likewise, Dickson's non-occupational exposure to materials containing benzene would also be contributing factors.  (Exhibit K, Brautbar depo., pp. 35-36).  However, Brautbar has not undertaken any scientific analysis, experiment or testing to determine Dickson's life dose of benzene from non-occupational sources and, therefore, has not been able to compare the extent of Dickson's occupational exposure versus his non-occupational exposures.  (Exhibit K, Brautbar depo., p. 47).  This deficiency in Brautbar's differential diagnosis is all the more glaring given Brautbar's own admission that non-occupational benzene exposure is generally in the parts per million – the equivalent of his alleged occupational exposure at National Maintenance.  (Exhibit K, Brautbar depo., p. 47).

Moreover,  using only temporal relationship analysis, without further explanation or thoughtful analysis,  Brautbar rules out all "other causes for multiple myeloma."  (Exhibit I, Brautbar 2/17/09 report, p. 16).  Of course, Brautbar fails to identify what these "other causes" are, much less provide a reasonable explanation for why he has so flippantly concluded that these "other causes"

---

[4] Brautbar cites *National Industrial Chemicals Notification and Assessment Scheme. Benzene. Priority Existing Chemical Assessment Report No. 21. Commonwealth of Australia, 2001* for this estimate.  This source examined cigarettes for sale in the United Kingdom and does not provide an explanation of how this compares to cigarettes sold in the United States.  Further, the exposure value is for continuous inhalation (24 hours per day, 7 days a week, 365 days per year).

did not cause Dickson's multiple myeloma.  Thus, Brautbar's cursory "ruling out" of other causes

for multiple myeloma is not reliable scientific methodology.

## V.    DISCUSSION

Defendant contends that Plaintiff's experts' medical causation opinions are unreliable and

not based on scientifically valid methodology for determining the cause of Plaintiff's multiple

myeloma.  Because the "knowledge" requirement of Rule 702 requires "more than subjective belief

or unsupported speculation," their testimony should be excluded.  *Daubert*, 509 U.S. at 590.  As the

proponents of expert testimony on medical causation, Plaintiff "must establish its admissibility by

a preponderance of proof."  *Nelson v. Tenn. Gas. Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

### A.    GENERAL CAUSATION

Despite the speculation and slight of hand maneuvers by each of Plaintiff's experts, one

inescapable fact remains – diesel exhaust has never been shown to actually cause multiple myeloma.

This truth compels the exclusion of Plaintiff's experts due to their inability to provide reliable

testimony in compliance with the "scientific knowledge" requirement of Rule 702.

Using the *Daubert* factors, it is true that Plaintiff's theory – diesel exhaust causes multiple

myeloma – has been tested.  The problem is, the theory has yet to pass the test.  In their reports,

Plaintiff's experts have cited to various studies examining a multitude of possible correlations, some

of which have no relationship to this case.  Not a single study has concluded that diesel exhaust is

in fact capable of causing multiple myeloma, a fact each of Plaintiff's experts has conceded.

(Exhibit D, Rudo depo., pp. 60-61, 64-65, 69-70; Exhibit E, Mehlman report, p. 17; Exhibit I,

Brautbar 2/17/09 report, p. 15; Exhibit J, Brautbar 7/21/09 report, p. 8; Exhibit K, Brautbar depo., pp. 9, 69).[5]

The best Plaintiff's experts can do is pluck anomalous studies from the body of scientific literature that have reported <u>associations</u>. The anomalous nature of these studies is apparent from Mehlman's refusal to discuss those studies pertaining specifically to diesel exhaust. Moreover, Brautbar was only able to locate 2-3 studies in the entire body of literature that have found an association between diesel exhaust and multiple myeloma and even he admits that the majority of studies on the topic did not find an association to exist. (Exhibit K, Brautbar depo., pp. 66, 111). Association is not causation. This basic tenant of epidemiology confirms the absence of general causation and the specious nature of Plaintiff's experts' opinions.

In an attempt to obfuscate the fact that diesel exhaust has never been shown to cause multiple myeloma, Plaintiff's experts attempt to divert the Court's attention to benzene – a component of diesel exhaust. (Exhibit F, Mehlman depo., pp. 33-34, 53; Exhibit G, Wabeke report, p. 4; Exhibit I, Brautbar 2/17/09 report, p. 3). The problem with this attempted diversion is that benzene has never been shown to cause multiple myeloma either. Again, Plaintiff's experts seek to blur this failure by pointing to studies that have found associations between benzene and multiple myeloma. (Exhibit C, Rudo report, p. 2; Exhibit D, Rudo depo., pp.60-61, 64-65; Exhibit E, Mehlman report, pp. 17, 21; Exhibit I, Brautbar 2/17/09 report, pp. 10-14). However, just as with diesel exhaust, the vast majority of studies have reached the opposite conclusion – that no association exists between benzene and multiple myeloma. (Exhibit I, Brautbar 2/17/09 report, p. 15; Exhibit J, Brautbar

---

[5] Wabeke testified he is unable to provide medical opinions and did not review the literature to regarding any potential link between diesel exhaust and multiple myeloma. (Exhibit H, Wabeke depo., pp. 16, 29, 61).

7/21/09 report, p. 8).  Moreover, some of the studies Plaintiff's experts rely on to show the existence

of an association were examining cancers other than multiple myeloma and, therefore, are

inapposite.[6]  Not one of Plaintiff's experts has cited the Court to any peer reviewed literature finding

benzene actually causes multiple myeloma.

The spurious nature of these studies as they apply to the claims asserted in this case is further

highlighted by the fact that people are exposed to benzene on a daily basis for a plethora of sources,

most of which are not occupationally induced.  (Exhibit D, Rudo depo., 90; Exhibit F, Mehlman

depo., pp. 50, 53).  In fact, cigarette smoke is the largest single source of benzene in America.

(Exhibit F, Mehlman depo., pp. 50, 53).  Despite these stubborn facts, Plaintiff's experts urge the

Court to believe that benzene from occupational sources can cause multiple myeloma, but benzene

from cigarettes cannot.  (Exhibit F, Mehlman depo., pp. 84-85; Exhibit J, Brautbar 7/21/09 report,

pp. 10, 14; Exhibit K, Brautbar depo., p. 115).  Simply put, this is not reliable science.

What is more, none of the studies cited by Plaintiff's experts examined the issue in the

context of exposure to diesel exhaust or benzene in a manner even remotely similar to Dickson.

Rather, the studies cited examined workers in the printing industry, oil industry employees,

employees of a chemical plant, employees of a rubber plant, painters, production workers,

construction, and drilling/mining workers.   (Exhibit I, Brautbar 2/17/09 report, pp. 11-15).

Plaintiff's experts make no attempt to correlate the exposures in the employment contexts examined

---

[6] Brautbar cites Flodin, et al. [1987], which examined the relationship between multiple myeloma and engine exhaust.  (Exhibit K, Brautbar depo., pp. 12, 14).  He also cites Infante [1995], which examined benzene and leukemia.  (Exhibit J, Brautbar 7/21/09 report, p. 10, Ex. P).  Brautbar also cites Kirkeleit, et al. [2008], which looked at benzene and human hematopieses, not multiple myeloma.  (Exhibit J, Brautbar 7/21/09 report, pp. 10-11, Ex. Q).  Mehlman claims that benzene "relates" to the development of al lymphoreticular hemopoietic tumors. (Exhibit F, Mehlman depo., pp. 33-34, 53).

in the studies to Dickson's exposure.  This discrepancy further highlights the limited usefulness of the studies and their altogether tenuous application to the critical issues presented in this case.

Based on the foregoing, there is no reliable scientific or medical basis for the claim that diesel exhaust is actually capable of causing multiple myeloma.  Such a conclusion is not scientifically valid and is not generally accepted.  Expert testimony to the contrary is nothing more than baseless speculation and is inadmissible.

### B.     SPECIFIC CAUSATION

Having failed to establish general causation, the examination of specific causation is unnecessary.  Clearly, if diesel exhaust (or benzene) is not known to be capable of causing multiple myeloma, it cannot reliably be said to have caused Dickson's multiple myeloma.  Even assuming, however, that diesel exhaust could cause multiple myeloma, which it does not, specific causation is also lacking.

### 1.     Dose

"Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 195, 199 (5th Cir. 1996).  Plaintiff's experts fail to provide anything but subjective belief in an effort to attain this minimal requirement.

First, Plaintiff's experts have failed to establish the level of exposure to diesel exhaust – or benzene – at which multiple myeloma is expected to develop.  (Exhibit D, Rudo depo., pp. 74-75, 104, 106; Exhibit F, Mehlman depo., pp. 48, 51-52; Exhibit K, Brautbar depo., pp. 129-30).  By virtue of the fact that there is no known threshold dose of diesel exhaust at which multiple myeloma

can be expected to develop, it is scientifically impossible to say that Dickson's exposure to diesel exhaust was of the magnitude at which it could be expected for multiple myeloma to develop.

Attempting to avoid this fatal flaw, Plaintiff's experts claim that his exposure to diesel exhaust was above or in excess of "normal exposure" levels.  (Exhibit C, Rudo report, p. 1; Exhibit D, Rudo depo., p. 121; Exhibit G, Wabeke report, pp. 4-5; Exhibit H, Wabeke depo., p. 64; Exhibit I, Brautbar 2/17/09 report, p. 2; Exhibit J, Brautbar 7/21/09 report, p. 8).  However, "normal" remains undefined.  As stated above, the reason why there is no discussion of what is "normal" is due to the fact that no threshold dose is known.  Thus, Plaintiff's experts resort to using nonspecific terms indicating that Dickson's exposure was above this theoretical threshold.  Broad sweeping terminology cannot cure the lack of scientific methodology.

Second, the dose of Dickson's actual exposure to diesel exhaust in the pilothouse of the M/V E.W. Thompson remains unknown.  Admittedly, none of Plaintiff's experts have conducted any scientific testing or modeling in an attempt to quantify Dickson's actual exposure to diesel exhaust in the pilothouse during his employment at National Maintenance.  (Exhibit D, Rudo depo., pp. 31, 75, 77, 100, 111; Exhibit F, Mehlman depo., pp. 13-14, 45, 65, 71; Exhibit G, Wabeke report, p. 3; Exhibit H, Wabeke depo., pp. 33, 62-63, 121; Exhibit K, Brautbar depo., pp. 31, 64, 108).  Likewise, no testing was performed to ascertain the benzene content in the diesel exhaust to which Dickson was allegedly exposed.  (Exhibit H, Wabeke depo., p. 83).

However, in yet another attempt to obscure the absence of necessary facts, Plaintiff's experts unreliably attempt to estimate by extrapolation Dickson's exposure to diesel exhaust, claiming it had

to be in the parts per million.[7]  (Exhibit D, Rudo depo., pp. 87, 102).  Rudo justifies his parts per million opinion by relying on anecdotal information from testing conducted in various contexts throughout his career as a toxicologist for the State of North Carolina, not peer reviewed literature. (Exhibit D, Rudo depo., pp. 87, 102).  Moreover, he acknowledges that diesel fuel formulations vary over time, altering the composition of diesel exhaust.  (Exhibit D, Rudo depo., p. 96).  This fact, juxtaposed against the lack of specific information about Rudo's anecdotal testing in years past, prohibits a reliable comparison between Rudo's anecdotal testing and the M/V E.W. Thompson during Dickson's employment.

Similarly, Wabeke relies on his personal experience taking air samples of diesel exhaust emissions at Ford in the 1970s as support for his conclusion that the level of benzene in the pilothouse would have been in the range of 2-13 parts per million.  (Exhibit H, Wabeke depo., pp. 99-100).  However, Wabeke has provided no foundation to support this extrapolation.  The testing was conducted 40 years ago.  There is no indication that the diesel fuel used in the Ford cars is of the same type or formula as that used aboard the M/V E.W. Thompson.  Likewise, Wabeke does not provide any understanding of how Ford engines and related combustion process compare to the M/V E.W. Thompson.  As a result, Wabeke's extrapolation based on prior testing in the 1970's lacks a proper foundation, rendering it unreliable.  Further, to the extent Brautbar's opinion is relying on Wabeke's parts per million opinion, Brautbar's conclusions are also unsupported.

Both Brautbar and Wabeke attempt to extrapolate dose from Dickson's 2002 reports of headaches, fatigue, dizziness, and changes in vision.  (Exhibit G, Wabeke report, p. 2; Exhibit K,

---

[7]Mehlman made no effort to ascertain the PPM-year dosage of benzene Dickson experienced due to his alleged exposure to diesel exhaust.  (Exhibit F, Mehlman depo., pp. 45, 71).

Brautbar depo., pp. 31-33).   However, Plaintiff's own testing and medical records negate this conclusion.   Wabeke and Brautbar agree that if there was substantial exposure to diesel exhaust in the pilothouse, carbon monoxide levels would also be elevated. (Exhibit H, Wabeke depo., p. 63; Exhibit K, Brautbar depo., p. 54).   However, as noted in Dickson's August 2, 2002 medial record, Dickson took a carbon monoxide monitor to work and found carbon monoxide levels in the pilothouse were normal.   (Exhibit K, Brautbar depo., Ex. 7).   Moreover, there is no indication in the medical records that Dickson was ever diagnosed with carbon monoxide poisoning.   (Exhibit K, Brautbar depo., p. 64, Ex. 7).   Clearly, neither expert has made the effort to confirm that Dickson's alleged symptoms chronically correspond with his alleged "substantial exposure" to diesel exhaust. (Exhibit H, Wabeke depo., pp. 73-74, 82).   This failure is especially glaring due to the fact that the concentration of diesel exhaust in the pilothouse would be variable.   (Exhibit H, Wabeke depo., pp. 76, 86, 91).

In a last ditch effort, Brautbar asserts that knowledge of the actual exposure level is not necessary, given the temporal relationship between Dickson's alleged "substantial" – yet unquantified – exposure to diesel exhaust/benzene and his diagnosis with multiple myeloma. (Exhibit J, Brautbar 7/21/09 report, p. 13).   This is classic *post hoc ergo propter hoc* rationale that confuses coincidence with causation.   Reliance on temporal proximity, without more, is insufficient to establish causation.   *Bland v. Verizon Wireless, LLC*, 538 F.3d 893, 897 (8th Cir. 2008).   In the absence of an established scientific connection between exposure and illness, the temporal connection between exposure to toxins and an onset of symptoms, standing alone, is entitled to little weight in determining causation.   *Id*. at 898-99.   Temporal proximity is not proper scientific methodology and in no way proves that diesel exhaust caused Dickson's multiple myeloma.

For the reasons stated above, Plaintiff's experts are unable – through citation to peer reviewed literature, testing or reliable scientific methodologies – to establish the threshold dose of diesel exhaust that is capable of producing multiple myeloma, much less the level of Dickson's exposure aboard the M/V E.W. Thompson that supposedly exceeded the unknown threshold.

### 2.    Differential Diagnosis

The most significant scientific shortcoming of Plaintiff's experts' analysis relates to the problem of "idiopathic" disease.  Idiopathic diseases are diseases for which the cause or all causes are unknown.  (Exhibit B, Gerr Decl., ¶ 4).  Even assuming, *arguendo*, that diesel exhaust and/or benzene are capable of causing multiple myeloma, these agents do not cause every case of multiple myeloma and the entire universe of potential causes remains unknown.  (Exhibit F, Mehlman depo., p. 53).  Thus, multiple myeloma is capable of being caused idiopathically.

For this reason, when performing a differential diagnosis, a medical causation expert utilizing precepts of science and medicine to attribute cause must be able to identify a science-based method by which he can, for a given individual, rule out an idiopathic cause in favor of the toxic/chemical cause.  The same holds true for other possible causes, as well as all other sources of the allegedly causative toxin.

In examining the attempted differential diagnoses performed by Plaintiff's experts, it is clear that not a single one of them mentioned, much less reliably excluded, an idiopathic cause for Dickson's multiple myeloma.  The failure to consider and reliably exclude an idiopathic cause has been repeatedly found to warrant the exclusion of causation experts.

In *Bland v. Verizon Wireless*, 538 F.3d 893 (8th Cir. 2008), the court rejected under *Daubert* a physician's expert opinion that plaintiff's asthma was caused by freon she had ingested.  "Dr.

Sprince's own testimony acknowledged the cause of exercise-induced asthma in the majority of cases is unknown.  Where the cause of the condition is unknown in the majority of cases, Dr. Sprince cannot properly conclude, based upon a differential diagnosis, Bland's exposure to freon was 'the most probable cause' of Bland's exercise-induced asthma." *Id.* at 897.

In *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814 (W.D. Tex. 2005), the expert conducted a differential diagnosis on several cancer patients and concluded in each case that ionizing radiation from the defendant's nearby uranium mill was a cause.  The court excluded the expert's opinion: "In fact, given that Dr. Dollinger does not appear to consider the fact that some cancers are due to unknown origins, it is possible that none of the possible causes he lists was an actual cause." *Id.* at 846.

In *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003), the plaintiff relied on her experts' differential etiology to prove that she suffered a stroke caused by the defendant's lactation drug.  The experts' opinions were excluded, however, because they did not "attempt to rule out an idiopathic stroke – that is, address the fact that stroke occurs in the general population with no known cause and in persons with no known risk factors." *Id.* at 480, 489.  The court stated: "Given plaintiff's experts' admissions that many strokes occur for which a particular cause cannot be ascertained even after extensive investigation, consistent application of their own methodology requires them to rule out such idiopathic stroke before reliably concluding that [the drug] caused the stroke." *Id.* at 517.

In *Nelson v. American Home Products Corp.*, 92 F. Supp. 2d 954, 970 (W.D. Mo. 2000), the plaintiff alleged that he suffered from an eye condition called AION caused by a prescription heart medication.  The plaintiff's expert summarily ruled out the possibility that the plaintiff suffered from

-32-

the idiopathic form of the disease because of the "temporal proximity" between the exposure to the medicine and the onset of the disease.  The court found this explanation insufficient and excluded the opinion.  "With no other basis for ruling out idiopathic AION, Dr. Johnson's differential diagnosis does not constitute reliable scientific knowledge." *Id*. at 971.

Here, multiple myeloma is an idiopathic disease, making it impossible to ignore and difficult to rule out.  Plaintiff's experts have not even tried.  Where the cause of the condition is generally unknown, an expert cannot properly conclude, based upon differential diagnosis, that the plaintiff's exposure to the alleged toxin was "the most probable cause" of injury.  *Bland*, 538 F.3d at 897.

Leaving aside the fatal failure to consider an idiopathic cause, the only expert to attempt a differential diagnosis was Brautbar.  After ruling out a few specific exposures, Brautbar attempted to rule out benzene from cigarette smoke as the alleged cause of Dickson's multiple myeloma. (Exhibit I, Brautbar 2/17/09 report, p. 16; Exhibit J, Brautbar 7/21/09 report, p. 10).  After Brautbar quantified Plaintiff's exposure to benzene from smoking at inconsistent levels, ranging from parts per billion to parts per million, he concluded that benzene from cigarettes was a minor substantial contributing factor in causing Dickson's multiple myeloma.  (Exhibit J, Brautbar 7/21/09 report, p. 10; Exhibit K, Brautbar depo., pp. 37, 46).  Likewise, he asserts that Dickson's other non-occupational exposures are contributing factors.  (Exhibit K, Brautbar depo., pp. 35-36).  Thus, while maintaining that Dickson's multiple myeloma was caused by his exposure to benzene, he has identified at least three sources of benzene exposure.  What leaves Brautbar's attempts to minimize the role of the non-occupational sources wanting, is his testimony that the non-occupational exposures would be in the parts per million – the equivalent level of Dickson's alleged workplace exposure.  (Exhibit K, Brautbar depo., p. 47).  Therefore, Brautbar cannot reliably conclude that the

parts per million of benzene in the pilothouse caused Dickson's cancer, while the non-occupational

parts per million of benzene did not.  Clearly, Brautbar's differential diagnosis is not the product of

reliable scientific analysis.  This same defect was repeated by Rudo and Wabeke.

Because benzene is ubiquitous in the environment, it could never be ruled out that

background levels of benzene – and background levels alone – were the sole cause of a plaintiff's

injury.  See, *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 156 (3rd Cir. 1999)(expert can be

excluded if he "did not offer detailed explanations for why he concluded that these [alternative

sources of benzene] were not the causes of plaintiff's illness. . . .").  If Plaintiff's experts cannot rule

out the possibility that background levels of benzene were the sole cause of Plaintiff's injuries, they

cannot opine that benzene from diesel exhaust emissions aboard the M/V E.W. Thompson was the

cause.

When considering proposed expert medical causation testimony, a number of "red flags"

have been identified by the Sixth Circuit, the existence of which demonstrate a lack of reliability.

*Best*, 563 F.3d at 177 (citing *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1025-28

(E.D. Tenn. 1999)).  These "red flags" include: (1) improper extrapolation; (2) reliance on anecdotal

evidence; (3) reliance on temporal proximity; (4) insufficient information about the case; (5) failure

to consider other possible causes; (6) lack of testing; and (7) subjectivity.  *Id.*  As discussed at length

above, each of these red flags are present in this case, clearly signaling the unreliable, speculative

nature of Plaintiff's experts' opinions.

## VI.    CONCLUSION

Plaintiff's experts bring nothing more than speculation and hyperbole to this case.  They have

assumed the role of advocates, not experts.  Because their opinions constitute the precise kind of

-34-

testimony the Supreme Court instructed the lower courts, as gatekeepers, to disallow, the testimony proffered by Rudo, Wabeke, Mehlman, and Brautbar should be excluded in their entirety.

Respectfully submitted,

**s/ Megan C. Ahrens**
Todd M. Powers (KY #83887)
Megan C. Ahrens (KY #92830)
Schroeder, Maundrell, Barbiere & Powers
5300 Socialville-Foster Road, Suite 200
Mason, OH 45040
(513) 583-4200 Tel.
(513) 583-4203 Fax
tpowers@smbplaw.com
mahrens@smbplaw.com
***Attorneys for Defendant***