UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:08-CV-00008

GERRY R. DICKSON                                                                    PLAINTIFF

V.

NATIONAL MAINTENANCE &
REPAIR OF KENTUCKY, INC.                                                    DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court upon Defendant's *Daubert* Motion to Exclude Plaintiff's Experts (Docket #80) and Motion for Summary Judgment (Docket #81). Plaintiff has responded (Docket #89, 90). Defendant has replied (Docket #96, 97). Plaintiff has filed a sur-reply (Docket #120.) This matter is now ripe for adjudication.

## BACKGROUND

Plaintiff Gerry Dickson was employed by Defendant National Maintenance & Repair of Kentucky, Inc. ("National Maintenance") to pilot the M/V E.W. Thompson, an inland river towing vessel. Dickson alleges that, beginning around December 2001 while working as a harbor pilot onboard this vessel, he was exposed to excessive and dangerous amounts of diesel exhaust due to the vessel's defective exhaust system. Diesel exhaust would enter the pilothouse to such an extent that Dickson's hands would turn black from touching the controls, as soot had accumulated all over his work area. He began experiencing such symptoms as migraines, burning skin and eyes, back aches, muscle pain, and fatigue. In 2004, National Maintenance extended the exhaust stacks to discharge emissions above the pilothouse. On August 6, 2005, Dickson's symptoms became so severe that he could not complete his shift. He piloted the vessel back to the dock and went to the emergency room. Dickson, at the age of 34, was diagnosed

with multiple myeloma.

Plaintiff filed the present lawsuit on January 15, 2008, pursuant to the Jones Act, 46 U.S.C. § 30104, and general maritime law. Plaintiff seeks tort damages, maintenance and cure benefits, punitive damages and attorney's fees. This matter is currently set for trial on May 23, 2011. Defendant contemporaneously filed a motion for summary judgment and a motion to exclude Plaintiff's experts on February 1, 2011. The Court now considers these motions.

## DISCUSSION

**I.** ***Daubert* Motion to Exclude Plaintiff's Experts**

Plaintiff has identified four experts to opine as to the alleged cause of his multiple myeloma: Dr. Myron Mehlman, Dr. Kenneth Rudo, Roger Wabeke, and Dr. Nachman Brautbar. Defendant seeks to exclude the opinions of all four experts. Defendant does not challenge the qualifications of Plaintiff's experts, but rather argues that their opinions are unreliable.

    *A.    The Jones Act*

As noted previously, Plaintiff's claims are brought pursuant to the Jones Act, 46 U.S.C. § 30104, and general maritime law. Under the Jones Act,

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.

46 U.S.C. § 30104. In general, to establish negligence under the Jones Act, "'a plaintiff must show that her employer failed to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure caused the plaintiff's injuries and damages.'" *Taylor v. TECO Barge Line, Inc.*, 517 F.3d

2

372, 383 (6th Cir. 2008) (quoting *Rannals v. Diamond Jo Casino*, 265 F.3d 442, 449 (6th Cir. 2001)).  Although the burden of proof on the issue of causation is relaxed under the Jones Act, *see Taylor*, 517 F.3d at 383, "*Daubert*'s standards for determining the admissibility of expert testimony apply regardless of whether the plaintiff's burden to prove causation is reduced." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 47 (2d Cir. 2004).

Plaintiff alleges that Defendant's negligence caused him to be exposed to dangerous amounts of diesel exhaust, which in turn caused his multiple myeloma.  "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).  Plaintiff is required to submit expert testimony on the issue of causation, as such information is clearly beyond the knowledge of a lay juror.  *See Wills*, 379 F.3d at 46 ("Indeed, this court has never held that a Jones Act plaintiff can survive summary judgment in a toxic tort case without admissible expert testimony on the issue of causation.").

Proving causation in toxic tort cases involves a two-step process: "First, the district court must determine whether there is general causation.  Second, if it concludes that there is admissible general-causation evidence, the district court must determine whether there is admissible specific-causation evidence."  *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citation omitted).  "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury."  *Id.*; *accord* Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 392 (2d ed. 2000) ("General causation is

concerned with whether an agent increases the incidence of disease in a group and not whether the agent caused any given individual's disease.").  To establish specific causation, an expert must demonstrate the following:

> (1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff [i.e., general causation]; (2) the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes.

*Adams v. Cooper Indus., Inc.*, No. 03-476-JBC, 2007 WL 2219212, at *3 (E.D. Ky. July 30, 2007) (citing David L. Eaton, *Scientific Judgment and Toxic Torts - A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & POL'Y 5, 38-40 (2003); *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1095 (E.D. Tenn. 1999)).

    *B.*    *Daubert Standard*

    Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  Rule 702 was amended in 2000 to address the Supreme Court's seminal opinion of *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny, including *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).  *See* Fed. R. Evid. 702, Advisory Committee Notes.

    "As a gatekeeper, the trial judge has discretion in determining whether a proposed

expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Rose v. Truck Centers, Inc.*, No. 09-3597, 2010 WL 3069613, at *4 (6th Cir. Aug. 6, 2010) (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007); *Daubert*, 509 U.S. at 589)).  The trial judge must assess "whether the reasoning of methodology underlying the testimony is scientifically valid and [ ] whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

The Supreme Court, in *Daubert*, provided a non-exclusive list of factors for trial courts to consider in evaluating reliability.  *Daubert*, 509 U.S. at 593-594.  These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation and general acceptance in the scientific community."  *In re Scrap Metal Antitrust Litig.*, 527 F.3d, 517, 529 (6th Cir. 2008) (citing *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).  The test of reliability, however, is a flexible one.  *Id.*  "A court must be sure not 'to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.'"  *Id.*  Reliability instead means "an expert's testimony . . . must be 'supported by appropriate validation –i.e., 'good grounds,' based on what is known."  *Id.* (citing *Daubert*, 509 U.S. at 590).  "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation."  *Id.* at 529-30.

   C.    *Plaintiff's Experts*

Plaintiff seeks to introduce the expert opinions of four experts: Dr. Myron Mehlman, Dr. Kenneth Rudo, Roger Wabeke, and Dr. Nachman Brautbar.  Defendant does not challenge the qualifications of these experts.  Rather, Defendant seeks to exclude the opinions of all four

experts because they are unreliable.

> 1.    Dr. Myron Mehlman

Dr. Myron Mehlman is Plaintiff's toxicology expert who will testify "with reasonable scientific probability a high degree of certainty, that Mr. Dickson's exposures contributed substantially to his developing multiple myeloma." Mehlman Report, DN 90-12, p. 22. Dr. Mehlman reviewed the expert reports of Drs. Rudo, Brautbar, Gerr, and McCracken, as well as Plaintiff's deposition. He also spoke directly with Dr. Brautbar.

According to Dr. Mehlman, diesel exhaust contains several chemicals "including benzene and 1,3 butadiene, and various polycyclic aromatic hydrocarbons (PAH's) that are known human carcinogens." Mehlman Declaration, DN 90-10, ¶ 14. "Benzene is recognized as a human carcinogen by the EPA, IARC, and NIOSH. Benzene is a hematopoietic toxin, i.e., benzene is toxic to the blood and blood-forming organs." *Id.* Dr. Mehlman notes "there is an overwhelming amount of scientific, peer reviewed literature that establishes that exposure to benzene can cause human multiple myeloma." *Id.* at ¶ 18.

> 2.    Dr. Kenneth Rudo

Dr. Kenneth Rudo, State Toxicologist for the State of North Carolina, will testify to a reasonable degree of toxicological certainty that "beginning in December 2001, and for a period of approximately 30-36 months after that, Mr. Dickson was significantly exposed to diesel exhaust in the pilothouse." Dr. Rudo Declaration, DN 90-14, ¶ 9. Specifically, "Mr. Dickson was exposed to benzene levels, at the very least, of parts per million or milligrams per cubic meter in the pilothouse." *Id.* at ¶ 24. It is Dr. Rudo's opinion "to a reasonable degree of toxicological certainty, that Mr. Dickson's exposure to diesel exhaust and benzene in the

pilothouse of the boat he worked on is more likely than not linked to his multiple myeloma." *Id.*
at ¶ 29.

> 3.    Roger Wabeke

Plaintiff's expert Roger Wabeke is "an industrial hygienist, chemical safety engineer, and
occupational, environmental, and applications toxicologist."  Wabeke Declaration, DN 90-16, ¶
1.  He reviewed Dr. Rudo's report, Plaintiff's deposition, and the scientific literature.  He also
interviewed Plaintiff at length.  Mr. Wabeke intends to offer the opinion that "Mr. Dickson was
substantially, significantly, and chronically exposed to diesel exhaust and diesel soot
particulates." *Id.* at ¶ 14.  He has concluded that Plaintiff "was exposed to benzene levels from
the diesel exhaust emissions that were, at least at times, in the range of 2-13 parts per million of
benzene vapor plus benzene absorbed on soot particles." *Id.* at ¶ 21.  He bases this estimate on
his prior experience performing basic air modeling for diesel exhaust emitted from school buses
in Avon, Ohio, his career at Ford Motor Company where he personally took air samples of diesel
exhaust emissions, and his investigation of diesel exhaust emissions emitted at a Greyhound bus
terminal in Detroit.

> 4.    Dr. Nachman Brautbar

Finally, Dr. Nachman Brautbar, who has experience in internal medicine, nephrology
toxicology and pharmacology, intends to testify "that exposure of Mr. Dickson to engine
emissions at the boathouse as described by Dr. Rudo was a substantial factor in the causation of
Mr. Dickson's multiple myeloma."  Brautbar Med. Report, DN 90-1, p. 17.  Dr. Brautbar bases
his opinion on Dr. Rudo's findings as well as his own review of Plaintiff's medical records and
the scientific literature.  Dr. Brautbar also conducted a differential diagnosis, ruling out other

7

possible causes for multiple myeloma such as exposures to pesticides, radiation, and creosote, as well as factors such as old age, smoking, and family history.

D.      *General and Specific Causation*

Defendant seeks to exclude the opinions of Plaintiff's experts because (1) scientific studies have not established that diesel exhaust actually causes multiple myeloma, and thus there is no general causation; (2) Plaintiff's experts have failed to establish the threshold dose at which multiple myeloma is expected to develop and the dose Plaintiff was exposed to, thus precluding any finding of specific causation; and (3) any differential diagnosis by Plaintiff's experts is unreliable because multiple myeloma is an idiopathic disease and Plaintiff's experts have failed to rule out any idiopathic cause for Plaintiff's multiple myeloma.

1.      General Causation

First, Defendant argues that there is no scientific basis for concluding that diesel exhaust causes multiple myeloma. Multiple myeloma is a cancer of plasma cells originating in bone marrow. Small tumors develop in various bones of the body, often at the same time. Multiple myeloma is classified as one of many hematologic cancers, or cancers of the blood, which include leukemia and lymphoma. *See generally* Multiple Myeloma Research Foundation, *What is Multiple Myeloma*, http://www.themmrf.org/living-with-multiple-myeloma/newly-diagnosed -patients/what-is-multiple-myeloma/ (last visited April 21, 2011); Stedmans Med. Dictionary 264750 (27th ed. 2000). Diesel exhaust is composed of known human carcinogens, including benzene. According to the Centers for Disease Control and Prevention ("CDC"), benzene naturally occurs in crude oil, gasoline, and cigarette smoke. It is also found in small quantities in the ambient air. CDC, *Facts About Benzene*, Emergency Preparedness & Response,

http://www.bt.cdc.gov/agent/benzene/basics/facts.asp (last visited April 21, 2011); *see generally*

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 615-16 (1980).

Plaintiffs' experts primarily rely on epidemiologic studies showing an association

between either diesel exhaust and multiple myeloma or benzene and multiple myeloma.

"Epidemiology assumes that disease is not distributed randomly in a group of individuals and

that identifiable subgroups, including those exposed to certain agents, are at an increased risk of

contracting particular diseases." Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC

EVIDENCE 335 (2d ed. 2000). These studies focus on the issue of general causation and may

show a positive association, negative association, or no association between an agent and a

disease. *Id.* at 336. "[I]t should be emphasized that an association is not equivalent to

causation." *Id.* (emphasis removed). Causation is determined by those interpreting

epidemiologic data. *Id.* at 374. "While the drawing of causal inferences is informed by

scientific expertise, it is not a determination that is made by using scientific methodology." *Id.*

at 375. In assessing causation, researchers look to several factors, including, but not limited to,

temporal relationship, strength of the association, consideration of alternative explanations, and

consistency with other knowledge. *Id.*

"Epidemiology is usually the best evidence of general causation in toxic tort cases."

*Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 875 (S.D. Ohio 2010) (citing *Norris v. Baxter*

*Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005)). If the trial court determines, however,

that such studies are insufficient to support an expert's opinion as to causation, the trial court

may properly exclude expert testimony. *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-

47 (1997)).

9

Generally, in analyzing an epidemiological study to determine if there is an association between an agent and a disease, a researcher calculates the relative risk. Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 348 (2d ed. 2000). Relative risk is "the ratio of the incidence rate . . . of disease in exposed individuals to the incidence rate in unexposed individuals." *Id.* If the relative risk is 1.0, the risk is the same for exposed and unexposed individuals. *Id.* at 349. If the relative risk is greater than 1.0, there is a positive association between the agent and the disease. *Id.* An odds ratio is similar as it expresses "the ratio of the odds that a case (one with the disease) was exposed to the odds that a control (one without the disease) was exposed." *Id.* at 350. After calculating the relative risk or odds ratio, researchers also determine if the study is statistically significant. *Id.* at 359. "A study 'is considered 'statistically significant' only when the odds ratio is expressed with a 95% confidence interval (consistently) and when that interval does not include an odds ratio of 1.0 or below.'" *Baker*, 680 F. Supp. 2d 881 n. 11 (quoting *Smith v. Wyeth-Ayerst Lab. Co.*, 278 F. Supp. 2d 684, 691 n. 8 (W.D.N.C. 2003)). For instance, a study showing a relative risk (RR) or odds ratio (OR) of 2.49, 95% confidence interval (CI) 1.21-5.13 is statistically significant, while a study showing a RR of 1.20, 95% CI 0.45-3.29 is not statistically significant, but does demonstrate a positive association. A study showing (RR = 0.78, 95% CI = 0.32-1.89) is not statistically significant and demonstrates a negative association. "When the relative risk reaches 2.0, the agent is responsible for an equal number of cases of disease as all other background causes." Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 384 (2d ed. 2000).[1]

---

[1]For a further discussion, see *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1353 n. 1 (6th Cir. 1992).

10

The first concern the Court must address is whether Plaintiff's experts may rely on epidemiological studies addressing associations between benzene and multiple myeloma, since benzene makes up only a portion of diesel exhaust.  Defendant argues that studies finding an association between benzene and multiple myeloma cannot support a causal association between diesel exhaust and multiple myeloma because benzene and diesel exhaust are toxicologically distinct.  In support of this argument, Defendant cites to three studies and/or reports which found different results when diesel exhaust was examined as a whole versus benzene examined independently.  For instance, the President's Cancer Panel, 2008-2009 Annual Report analyzes diesel exhaust under the category "Petrochemicals and Combustion By-Products" while benzene is classified as a "Solvent."  President's Cancer Panel, *2008-2009 Annual Report*, DN 90-22, p. 5-6.  The report does not indicate that diesel exhaust has a causal link to multiple myeloma, though it notes that there is strong evidence of a causal link between benzene and multiple myeloma.  *Id.* at 6.  The report also notes, however, that benzene is contained in crude oil, gasoline, and cigarette smoke.  *Id.*

The second study cited by Defendant noted an increased risk for multiple myeloma in regard to diesel exhaust, but not in regard to organic solvents, like benzene.  *See* Won Jin Lee et al., *Multiple Myeloma and Diesel and Other Occupational Exposures in Swedish Construction Workers*, 107 INT'L J. CANCER 134 (2003).  Finally, a third study reported different associations between benzene and multiple myeloma than between engine exhaust and multiple myeloma. *See* Ellen Heineman et al., *Occupational Risk Factors for Multiple Myeloma Among Danish Men*, 3 CANCER CAUSES & CONTROL 555 (1992).  Based upon these differences, Defendant argues that the health effects of benzene are clearly not the same as those of diesel exhaust.

11

Plaintiff's experts generally fail to differentiate between benzene and diesel exhaust. Instead, it appears that these experts refer to benzene and diesel exhaust interchangeably or focus entirely on benzene. At the same time, however, both parties agree that benzene is a component of diesel exhaust. Benzene may be considered a causative agent despite only being a component of the alleged harm. *See Baker*, 680 F. Supp. 2d at 876 n.6 (In personal injury case alleging harm from refinery emissions in which the submitted medical literature focused almost exclusively on benzene, the district court noted that "while this may not be a 'pure' benzene case, benzene is surely the alleged causative agent . . . ."). Thus, the Court believes that consideration of both benzene and diesel exhaust studies is appropriate in this case. Defendant is certainly free to challenge these studies and their differential findings on cross-examination.

Next, Defendant challenges the studies upon which Plaintiff's experts rely. The Court notes that Plaintiff's experts have examined studies displaying statistically significant associations between benzene and multiple myeloma as well as between diesel exhaust and multiple myeloma. *See, e.g.*, Ulf Flodin et al., *Multiple Myeloma and Engine Exhausts, Fresh Wood, and Creosote: A Case-Referent Study*, 12 AM. J. IND. MED. 519 (1987) (RR 2.3, 95% CI = 1.40-3.70); Eva S. Hansen, *A Mortality Study of Danish Stokers*, 49 BRITISH J. IND. MED. 48 (1992) (RR 3.88, 95% CI 1.06-9.94); Peter F. Infante, *Benzene Exposure and Multiple Myeloma*, 1076 N.Y. ACAD. SCI. 90 (2006) (RR 2.13, 95% CI = 1.31-3.46); Jorunn Kirkeleit et al., *Increased Risk of Acute Myelogenous Leukemia and Multiple Myeloma in a Historical Cohort of Upstream Petroleum Workers Exposed to Crude Oil*, 19 CANCER CAUSES & CONTROL 13 (2007) (RR 2.49, 95% CI = 1.21-5.13); Won Jin Lee et al., *Multiple Myeloma and Diesel and Other Occupational Exposures in Swedish Construction Workers*, 107 INT'L J. CANCER 134 (2003) (RR

12

1.3, 95% CI = 1.04-1.71); Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment*, 316 NEW ENGLAND J. MED. 1044 (1987) (RR 4.09, 95% CI 1.10-10.47). "Courts should normally require more than one epidemiological study showing a positive association to establish general causation, because a study's results must be capable of replication." *King v. Burlington N. Santa Fe Ry. Co.*, 762 N.W.2d 24, 48 (Neb. 2009) (citing *Richardson by Richardson v. Richardson-Merrell, Inc.*, 857 F.2d 823 (D.C. Cir. 1988)).

Plaintiff's experts also acknowledge that studies exist in which no statistically significant association is demonstrated. The expert reports indicate that the Plaintiff's experts have properly analyzed these studies for sampling errors such as bias and confounding.[2] The Court has also reviewed the findings of these studies and their statistical significance. There is enough evidence in this literature to support Plaintiff's experts' opinions as to general causation. Thus, the Court believes this issue is appropriately submitted to the jury.

2.      Specific Causation

"Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general-causation evidence." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citing *Raynor v. Merrell Pharm.*, 104 F.3d 1371, 1376 (D.C. Cir. 1997)). As noted previously, to establish specific causation, Plaintiff's experts must demonstrate:

(1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff [i.e., general causation]; (2) the

---

[2]A confounding factor is "[a] factor that is both a risk factor for the disease and a factor associated with the exposure of interest. Confounding refers to a situation in which the effects of two processes are not separated. The distortion can lead to an erroneous result." Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 389 (2d ed. 2000).

> individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes.

*Adams*, 2007 WL 2219212 at *3.  In general, an expert's opinion as to specific causation between an individual's exposure to a toxic agent and the onset of disease should consider "the individual's exposure, including the amount, the temporal relationship between the exposure and disease, and other disease-causing factors."  Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 422-23 (2d ed. 2000).  The expert's assessment of these factors is compared with relevant scientific data.  *Id.* at 423.

Defendant challenges the issue of specific causation by noting that Plaintiff's experts have failed to establish the amount of diesel exhaust or benzene to which Plaintiff was exposed, thus failing to adhere to one of the central tenets of toxicology that "the dose makes the poison . . . ."  *Id.* at 403.  Plaintiff's experts rely on the opinion of Dr. Kenneth Mark Rudo, a toxicologist, in finding that Plaintiff was exposed to toxicologically significant amounts of diesel exhaust and benzene for approximately 30-36 months.  Dr. Rudo has worked as a State Toxicologist for the State of North Carolina since 1989.  Dr. Rudo Declaration, DN 90-14, p. 1.  As part of his duties, Dr. Rudo investigated the air quality on approximately 100 boats, including 30-40 vessels utilizing closed pilothouses.  *Id.* at 3.  In tests involving the contamination of ground water by diesel fuel, Dr. Rudo determined that the benzene component in diesel fuel is between 1,000 and 1,500 parts per million.  *Id.* at 2-3.

While acknowledging that no quantitative tests were done as to Plaintiff's situation, Dr. Rudo notes that Plaintiff's account indicates he was exposed to airborne exhaust and diesel

14

particulate matter.  *Id.* at 4-5.  Dr. Rudo's declaration indicates that diesel particulate matter can penetrate the lungs in very small amounts and cause chronic health effects.  *Id.* at 3.  He bases this opinion on his review of the scientific literature and his experience, although he fails to note whether such chronic health effects include cancer, or more particularly, multiple myeloma.  *See id.*

Dr. Rudo concludes that Plaintiff "was exposed to benzene levels, at the very least, of parts per million or milligrams per cubic meter in the pilothouse."  *Id.* at 12.

> While there are no peer reviewed studies of diesel exhaust levels in particular boats, because such information is not the type of information that would be published in the peer reviewed literature, I base my opinion on several factors. First, given my knowledge of, generally speaking, how much benzene is in diesel fuel, one can estimate the amount of benzene that exists in diesel exhaust. Second, during my career, I have personally tested diesel exhaust in occupational settings that are similar to the one described by Mr. Dickson and can state, with certainty, that the benzene was in the parts per million range, and likely the high parts per million.

*Id.*  Dr. Rudo acknowledged in his deposition testimony that he has never investigated how much benzene a person might be exposed to as a result of breathing a particular concentration of diesel exhaust.  Dr. Rudo Depo., DN 96-4, p. 3.  He explained his estimate of parts per million as follows:

> A:   But, for example, benzene at .1 percent in diesel is a thousand parts per million.
>
> Q:   That's in – just so we're clear, what you're saying –
>
> A:   Before.
>
> Q:   – that's in diesel fuel before it's burned?
>
> A:   Yes.  Before it's burned.  So out of the combustion process a thousand parts per million because of the volatilization of benzene and its tendency to bind to particulate matter, you know, you're going to have part per

15

> million levels.  Whether it's 10 or 50 percent of what's in diesel fuel, you
> know, I can't tell you right off the top, but it will be part per million
> levels.
>
> Q:    So with regard to each of the toxins you've identified in the diesel
>       exhaust, the most you can say quantitatively is that it's your opinion that
>       they would be in the parts per million?
>
> A:    Yes, without measuring.

Dr. Rudo Depo., DN 80-5, p. 20.  He further acknowledged that no testing was done on the

engine of the M/V E.W. Thompson or similar engines.  *Id.* at 24.  Plaintiff's three additional

experts base their opinions on Dr. Rudo's part per million figure.

Dr. Brautbar asserts that the only safe level of exposure to benzene is zero parts per

million (ppm), i.e., there is no threshold level for benzene exposure.  Dr. Brautbar Med. Report,

DN 90-1, p. 8.  He bases this opinion on the reports of several regulatory agencies and scientific

data showing excessive risk of leukemia and other hematologic malignancies from benzene at

very low doses.  *Id.* at 6-10.  A no threshold model has been recognized scientifically as the "one

hit theory" of cancer risk.  Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC

EVIDENCE 407 (2d ed. 2000).  Epidemiological studies into the association between diesel

exhaust and multiple myeloma rarely observe an exposure-response relationship.  *See* Won Jin

Lee et al., *Multiple Myeloma and Diesel and Other Occupational Exposures in Swedish*

*Construction Workers*, 107 INT'L J. CANCER 134, 135 (2003) (noting that "[t]he absence of an

exposure response could indicate that diesel exposure is unrelated to the development of

myeloma.").

> In contrast to their exposure to drugs, only rarely are humans exposed to
> environmental chemicals in a manner that permits a quantitative determination of
> adverse outcomes. . . . Human exposure occurs most frequently in occupational
> settings where workers are exposed to industrial chemicals like lead or asbestos;

> however, even under these circumstances, it is usually difficult, if not impossible, to quantify the amount of exposure.  Moreover, human populations are exposed to many other chemicals and risk factors, making it difficult to isolate the increased risk of a disease that is due to any one chemical.

Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 405 (2d ed. 2000).

Given the difficulty in establishing Plaintiff's exposure as well as the possibility that threshold level for benzene exposure exists, the Court finds that Plaintiff's expert opinions as to the amount of exposure are sufficient.  In one study relied on by Plaintiff's experts, multiple myeloma was observed in workers exposed to benzene in the low ppm-year, similar to the estimates in this case by Mr. Wabeke.  *See* Robert A. Rinsky et al., *Benzene and Leukemia: An Epidemiologic Risk Assessment*, 316 NEW ENGLAND J. MED. 1044 (1987).  Rinsky et al. noted a "possibility that relatively low cumulative exposures to benzene may produce a relatively well-differentiated cancer such as multiple myeloma, whereas higher exposures may lead to leukemia."  *Id.* at 1049.  The Court finds that this study lends support to Plaintiff's expert opinions.  In addition, the Sixth Circuit has noted that when experts cannot establish a dose/response relationship, the alternative method of differential diagnosis may be appropriate.  *See Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255, 262 (6th Cir. 2001).

Defendant also argues that Plaintiff's experts, in conducting their differential diagnoses, failed to consider that multiple myeloma is an idiopathic disease.  "'A 'differential diagnosis [is] a technique that identifies the cause of a medical condition by eliminating the likely causes until the most probable cause is isolated.'" *Bland v. Verizon Wireless, (VAW) LLC*, 538 F.3d 893, 897 (8th Cir. 2008) (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000)).  An expert's differential diagnosis is considered reliable where the expert: "(1) objectively ascertains, to the extent possible, the nature of the patient's injury, (2) rules in one or more

17

causes of the injury using a valid methodology, and (3) engages in standard diagnostic techniques by which doctors normally rule out alternative causes to reach a conclusion as to which cause is most likely." *Quillen v. Safety-Kleen Sys., Inc.*, No. 07-67-EBA, 2010 WL 2044508, at *3 (E.D. Ky. May 21, 2010) (citing *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009)).

According to the Third Circuit, "[a] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999). Thus, an expert's failure to consider a potential origin goes to the weight of the expert's testimony, not its admissibility. *See id.* at 157. Where an unknown idiopathic origin accounts for a vast majority of cases, however, the Sixth Circuit has classified it as "impossible to ignore and difficult to rule out." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 675 (6th Cir. 2010). *Accord Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1162 (E.D. Wash. 2009) ("This is not to say that where most diagnoses of a disease are idiopathic it is impossible to prove specific causation . . . [b]ut in those cases, analysis beyond a differential diagnosis is required."); *Perry v. Novartis Pharm. Corp.*, 564 F. Supp. 2d 452, 471 (E.D. Pa. 2008) ("Because the differential diagnosis procedure that plaintiffs' experts employed fails to adequately account for the possibility that Andreas Perry's T-LBL was idiopathic, we find on this record that their conclusions . . . are unreliable and therefore inadmissible.").

The studies and reports cited by Plaintiff's experts in support of their opinions indicate that the etiology of multiple myeloma is largely unknown. *See, e.g.*, Ulf Flodin et al., *Multiple Myeloma and Engine Exhausts, Fresh Wood, and Creosote: A Case-Referent Study*, 12 AM. J.

18

IND. MED. 519 (1987) ("[L]ittle is known about the etiology of this disorder."); Ellen Heineman

et al., *Occupational Risk Factors for Multiple Myeloma Among Danish Men*, 3 CANCER CAUSES

& CONTROL 555 (1992); Won Jin Lee et al., *Multiple Myeloma and Diesel and Other*

*Occupational Exposures in Swedish Construction Workers*, 107 INT'L J. CANCER 134 (2003)

("The role of occupational exposures in the risk of myeloma is not clear.").  In addition, a World

Health Organization reference book, "WHO Classification of Tumours of Haematopoietic and

Lymphoid Tissues," notes that while antigenic stimulation and exposure to toxic substances have

been associated with multiple myeloma, "[m]ost patients have no identifiable toxic exposure or

known chronic antigenic stimulation."  World Health Organization, WHO CLASSIFICATION OF

TUMOURS OF HAEMATOPOIETIC AND LYMPHOID TISSUES 202 (2008) (excerpts at DN 128-9, p.

4).  Multiple myeloma is more common in men than women, occurs twice as frequently in

African Americans as Caucasians, and is uncommon in adults under the age of 30.  *Id.*  "[T]he

incidence increases progressively with age thereafter, with approximately 90% of cases

occurring over age 50 and a median age at diagnosis of about 70 years."  *Id.*  The risk of

developing multiple myeloma is significantly higher "for individuals with a first degree relative

with the disease."  *Id.*

     Dr. Brautbar conducted a differential diagnosis which he describes in his expert report as

follows:

> Based on the records available, the patient has been described and diagnosed with
> multiple myeloma under the age of 40, which is rare and raises a question of
> causation, since commonly multiple myeloma is a disease of old age.  There is no
> family history of multiple myeloma or hematological disease such as leukemia
> and lymphomas.  There is no evidence of heavy cigarette smoking for Mr.
> Dickson, although benzene from emitted cigarette smoke is taken into account in
> the causation analysis as a contributing factor, minor.  I have conducted
> differential diagnosis and differential causation: there is no evidence of radiation

exposure (prior to Mr. Dickson becoming a multiple myeloma patient), there is no evidence of heavy pesticide exposure, there is no evidence of heavy metal exposure, there is no evidence of creosote exposure.  I have employed the methodology of temporal relationship, differential causation, I have ruled out other causes for multiple myeloma and have relied on the scientific literature demonstrating benzene exposure and multiple myeloma, exposure to diesel which contains benzene and multiple myeloma.  In my causation analysis I have taken into account the cigarette smoking history of Mr. Dickson (Although the scientific literature does not recognize cigarette smoke as a cause for multiple myeloma).

Based on the material reviewed, the scientific literature described here, and employing the methodology employed by clinical physicians and toxicologists having ruled out other causes, having the history from Mr. Dickson and report of Dr. Rudo of substantial exposure to diesel exhaust and benzene, and scientific literature, it is my opinion with reasonable medical probability and certainty that exposure of Mr. Dickson to engine emissions at the boathouse as described by Dr. Rudo was a substantial factor in the causation of Mr. Dickson's multiple myeloma.

Dr. Brautbar Med. Report, DN 90-1, p. 16-17.  The Court finds that Dr. Brautbar's differential diagnosis adequately accounts for other possible causes of Plaintiff's disease, including idiopathic origin.  Dr. Brautbar specifically noted the fact that Plaintiff was young when he was diagnosed with multiple myeloma, which is exceptionally rare.  In addition, Dr. Brautbar's analysis rules out any family history of the disease.  The other factors considered by Dr. Brautbar are agents which have also shown some association to multiple myeloma.  *See, e.g.*, Ulf Flodin et al., *Multiple Myeloma and Engine Exhausts, Fresh Wood, and Creosote: A Case-Referent Study*, 12 AM. J. IND. MED. 519 (1987).  Finally, Dr. Brautbar accounts for Plaintiff's history of smoking, since cigarette smoke also contains benzene.

Dr. Mehlman also conducted a differential diagnosis.  In his deposition testimony, he states that he considered Plaintiff's smoking, exposure to radiation, whether he worked on cars or a farm, and his family history.  Dr. Mehlman Depo., DN 80-7, p. 6-7.  He also noted in his report Plaintiff's general good health prior to his diagnosis and that Plaintiff has no history of

20

drug or alcohol abuse.  Dr. Mehlman's diagnosis is based on the information contained in Dr. Brautbar's and Dr. Rudo's reports and deposition testimony.  The Court finds that Dr. Mehlman's differential diagnosis is also sufficient.

For the foregoing reasons, Defendant's motion to exclude as to Plaintiff's four experts is denied.

## II.    Motion for Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case.  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment.  A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

21

Defendant seeks summary judgment as to Plaintiff's Jones Act and unseaworthiness claims in conjunction with its *Daubert* motion because, if Plaintiff cannot establish medical causation through his experts, Plaintiff cannot meet his burden of proof.  As noted above, the Court denies Defendant's *Daubert* motion.  Thus, Defendant's motion for summary judgment as to Plaintiff's Jones Act and unseaworthiness claims is also denied.

Defendant also seeks summary judgment as to Plaintiff's claim for maintenance and cure.  A shipowner's duty to provide maintenance and cure "arises regardless of fault and whether or not employment on the ship actually caused the seaman's injury."  *Cunningham v. Interlake S.S. Co.*, 567 F.3d 758, 761 (6th Cir. 2009).  Maintenance refers to the shipowner's duty to provide food and lodging while cure is the shipowner's duty to provide medical care and attention "during the period of injury or illness."  *Id.*  In order to recover for maintenance and cure, Plaintiff must demonstrate that "(1) he was working as a seaman, (2) he became ill or injured while in the vessel's service, and (3) he lost wages or incurred expenditures relating to the treatment of the illness or injury."  *West v. Midland Enterprises, Inc.*, 227 F.3d 613, 616 (6th Cir. 2000).  Any ambiguities or doubts should be resolved in favor of Plaintiff.  *Id.* (quoting *Vaughan v. Atkinson*, 369 U.S. 527, 532 (1962)).

Defendant first argues that Plaintiff's injury did not manifest itself while he was in the ship's service, and thus, Defendant is not liable for maintenance and cure.  According to Plaintiff, he began experiencing migraine headaches and burning skin and eyes shortly after he began working on the M/V E.W. Thompson.  Around the spring of 2005, he also experienced shoulder and back pains and muscle aches, which were worse towards the end of his twelve hour shifts.  Plaintiff asserts that he also suffered from shortness of breath, nosebleeds, and fatigue.

22

On August 6, 2005, Plaintiff's symptoms were so severe that he piloted the M/V E.W. Thompson back to the dock and went to the emergency room.  There he was diagnosed with multiple myeloma.  The emergency room visit revealed he was suffering from severe anemia and kidney insufficiency.  According to his medical records, Plaintiff's back pain was attributable to fractures sustained as a result of myeloma tumors.  Plaintiff's doctors have testified that the symptoms he suffered before going to the emergency room were symptoms of multiple myeloma.  Based upon the totality of this information, the Court finds that there is a genuine issue of material fact as to whether Plaintiff's multiple myeloma manifested itself while he was in the ship's service.

In addition, Defendant asserts that because Plaintiff's disease is incurable, Defendant no longer has an obligation to pay maintenance and cure.  A shipowner's duty to provide maintenance and cure ends "when the seaman's affliction is cured or declared to be permanent." *Blainey v. American S.S. Co.*, 990 F.2d 885, 887 (6th Cir. 1993).  Defendant asserts that Plaintiff's affliction was declared permanent on August 6, 2005, when he was diagnosed with multiple myeloma, an incurable disease.

In contrast, Plaintiff argues that he has yet to reach "maximum medical recovery." *Vaughan*, 369 U.S. at 531 (maintenance and cure obligation "continues until he reaches maximum medical recovery").  The First Circuit has held that this dividing line of "maximum medical recovery" does not mean that the obligation to provide maintenance and cure automatically cuts off whenever a permanent condition exists.  *In re RJF Int'l Corp. for Exoneration from or Limitation of Liab.*, 354 F.3d 104, 107 (1st Cir. 2004).  If further treatment is more than merely palliative, such that it would aid in some permanent medical improvement,

maintenance and cure may be awarded.  *Id.*

Plaintiff notes that from August 2005 to September 2008 he underwent comprehensive treatment for his multiple myeloma such that his cancer is now in complete remission.  Without such treatment, he would have died within a short period of time.  Thus, Plaintiff asserts, this treatment was more than merely palliative.  In addition, while undergoing such treatment, Plaintiff developed a skin rash and liver irritation, manifestations of graft versus host disease (GVHD) which he is still receiving treatment for and which resulted from reduced immunosuppression treatment received while battling his multiple myeloma.  His treatment for GVHD continues to show improvement in his physical condition.  Thus, Plaintiff asserts, he has yet to reach maximum medical recovery, and he is still entitled to maintenance and cure.

Plaintiff was treated by Dr. Amir Toor, a practicing physician specializing in hematology and bone marrow transplantation, at Loyola University Medical Center from August of 2005 to August of 2007.  Dr. Toor initially treated Plaintiff through induction therapy, which was designed to put him into a long term remission.

> Q:    To a reasonable degree of medical certainty was that therapy offered to Mr. Dickson to improve his physical condition?
>
> A:    That therapy was offered to Mr. Dickson to improve his physical condition as well as to attempt to put him into a long term remission given his young age.  Our intent was to try to see if we could get him into a long term remission.
>
> Q:    What happens to a multiple myeloma patient if they don't get into remission?
>
> A:    In general, if they don't get into remission then they are likely to have, you know, they [sic] are two scenarios which could play out.  One would be the disease stays stable for a period of time and then progresses.  And in other instances the disease keeps on progressing.  In either case the disease would eventually supervene and the patient would succumb to

24

their cancer over a certain period of time.

Q:      When you say succumb, you mean die?

A:      Right.  Correct.

Q:      So at least initially the plan for the induction therapy was to prevent that
        progression towards death?

A:      Correct.

Dr. Toor Depo., DN 89-4, p. 8-9.  Dr. Toor also planned for Plaintiff to undergo transplantation

and chemotherapy, citing "multiple studies which have shown that survival is prolonged in

patients who undergo high dose chemotherapy and stem cell transplantation and the quality of

life is improved and so forth." *Id.* at 10.

Plaintiff took part in a national clinical trial involving high-dose chemotherapy and stem

cell transplantation performed in tandem with the goal of putting Plaintiff into a long term

remission.  *Id.* at 11.  Two months after the transplant, the cancer was still present, so Dr. Toor

decided to reduce the immunosuppression to allow the donor cells in Plaintiff's body to take

over and kill the host cancer cells.  *Id.* at 15.  Roughly four months after the transplant, Plaintiff

developed graft versus host disease (GVHD) as a result of the reduced immunosuppression.  *Id.*

Dr. Toor described this disease as a reaction in which "the donor immune system cells react to

the host's normal tissues."  *Id.*  Dr. Toor noted that multiple myeloma also causes weakness of

the bones which can take years to resolve, but treatment can strengthen the bones and there was

overall improvement noted in Plaintiff's May 2007 metastatic bone survey.  *Id.* at 17.

As of August 2008, Plaintiff's records indicate that he was in complete remission.  *Id.* at

18.  Dr. Toor noted:

A:      Going forward most people who go into a complete remission are more

25

> likely to stay in complete remission.  However, with myeloma
> unfortunately this disorder people have late recurrences.  Several of these
> trials . . . [have] recently shown that patients with the myeloma even after
> an allogeneic stem[ ] cell transplant still had a fairly high likelihood of
> recurrence of their disease.  So it's a good thing that he is in complete
> remission but he requires ongoing . . . monitoring to make sure that he
> doesn't relapse in the future.

*Id.*  Dr. Toor also noted that Plaintiff would need ongoing monitoring for his GVHD.  *Id.* at 19.

In regards to Plaintiff's treatment, Dr. Toor stated:

> A:      . . . [T]he allogeneic transplant effects are of course still being studied. . . .
> [A] proportion of patients do become long term survivors and potential[ly]
> may be cured of their illness.  Again, one needs to be careful when using
> that word, cure.  But certainly if I see another patient Mr. Dickson's age
> today that would be a strong consideration because with autologist
> transplant or chemotherapy the best you can offer patients who had the
> kind of disease that he had at presentation as advanced as his disease was,
> the best you could offer them would be a three or four year average
> survival.  But with aggressive treatment and incorporating transplantation
> you could potentially extend that so.

*Id.* at 20-21.  Dr. Toor then noted that without treatment, Plaintiff would have died within a

matter of months.  *Id.* at 21.  In addition, without the transplants, Dr. Toor doubts Plaintiff's

cancer would have gone into remission.  *Id.*  Dr. Toor was then questioned about the effect of

Plaintiff's treatments:

> Q:      Did each of the treatments and therapies that we have discussed here today
> that he was given at Loyola offer the possibility of the betterment of Mr.
> Dickson's therapy condition?
>
> A:      Yes, that's the goal of all of the therapy.
>
> Q:      Did all of the treatment he received at Loyola in fact improve his physical
> condition?
>
> A:      They did compared to how he had been when he had presented it stemmed
> the progression of his spinal disease.  So as we read the skeletal survey
> report he had not had any further fractures or any further bone loss, in fact,
> there was a little bit of improvement there.  His physical condition did

improve, obviously the side affects [sic] of graft versus host disease introduced a new element of compromise that complication and side affects [sic] aside I would say so, yes.  But ironically the graft versus host disease is probably also what put him in remission.

Q:     Doctor, based upon the notes that you have the last time he was seen as of August 2008, in your opinion to a reasonable degree of medical certainty did the therapies and treatments that we discussed that were offered at Loyola improve Mr. Dickson's bodily function to the point that life could be maintained to some degree of normalcy for him?

A:     Yes.  In one of my notes from 2007, actually, it states his physical strength was okay and he was able to go to the gym and even swim and so forth.  I don't know if he can still do these things and so on but his what we term performance status had improved as a consequence of therapy.

*Id.* at 21-22.  Finally, Dr. Toor acknowledged again that although there is a high risk for recurrences, some patients achieve "durable long term remissions and potentially [are] cured of their illness."  *Id.* at 23.  While Dr. Toor noted Plaintiff was more likely to not have a recurrence than to have one, he could not say with absolute certainty after four years that Plaintiff has been "cured."  *Id.*

Dr. Stacey Goodman, an internal medicine physician specializing in hematology, has treated Plaintiff since March of 2009.  Dr. Goodman testified that when Plaintiff arrived for treatment at the Nashville VA in 2009, their goal was to "try to do whatever we could to keep him sort of safer and suppress the graft-versus-host disease and improve his condition and his quality of life along the way."  Dr. Goodman Depo. I, DN 89-5, p. 26-27.  He was put on several medications and started receiving an immunosuppressive treatment called photopheresis.  *Id.* at 27.  Plaintiff still receives this treatment on a monthly basis.  *Id.* at 29.  Dr. Goodman noted that Plaintiff is still suffering from several complications of his GVHD, including eye pain, leg pain, and sores in his mouth.  *Id.* at 37-39.  He is more susceptible to infection and had suffered from

pneumonia in December of 2009.  *Id.* at 47.

Dr. Goodman confirmed that Plaintiff's GVHD was a result of his treatment for multiple myeloma.  Dr. Goodman Depo II, DN 89-6, p. 7.  In addition, Dr. Goodman testified that the treatments Plaintiff received at Loyola and Nashville were intended to improve Plaintiff's physical condition.  *Id.* at 9.

> Q:    Do you have an opinion to a reasonable degree of medical certainty based upon your review of the VA records in Marion and your treatment here as to whether or not the treatment at both facilities went beyond decreasing pain and suffering and gave him a reasonable chance of continuing with life for an indefinite period of time and some meaningful level of functioning?
>
> A:    Yes.
>
> Q:    And do you have an opinion to a reasonable degree of medical certainty as to whether or not the treatment that he received at both facilities enhanced his bodily function?
>
> A:    Yes.  Continue to try to do that with each visit.

*Id.* at 9-10.  Dr. Goodman also believes that Plaintiff is likely to have GVHD potentially the rest of his life.  *Id.* at 12.  "The hope would be that it can be controlled enough so that he could have reasonable quality of life, and that he can control it enough with treatments that don't put his life at risk every day or less at risk every day."  *Id.*  Dr. Goodman noted that Plaintiff is unlikely to ever be able to work a full-time job because of his GVHD.  *Id.* at 16.  Also, Dr. Goodman described his present restrictions as more likely than not permanent.  *Id.* at 17.

In regard to Plaintiff's multiple myeloma, Dr. Goodman testified that it is an incurable disease, "but there is a small subset of literature that shows some patients having very, very long and durable remissions, which at some point, if you live enough in remission, we call it cured."  *Id.* at 24.  Dr. Goodman also spoke of his current condition and his GVHD:

28

Q:      Is there a point at which you would say with regard to the graft-versus-host disease that he has reached a point of maximum medical improvement?

A:      No.  You mean like right now has he or is he still improving?

Q:      I'm asking has he ever reached that level?

A:      No.

Q:      And how is it that – I guess I need to know –

A:      He is improving, but he's continuing to improve so he's not –

Q:      I understood you to say earlier in your testimony that the limitations and symptoms he was having were more or less permanent.  Did I misunderstand that?

A:      Yes.  No.  No.  I don't think you misunderstood it.  They are more likely than not likely to continue permanently.

Q:      And when we say that his condition is permanent, that means that it's not likely to improve significantly, as I understand the medical terminology.  Am I wrong about that?

A:      Yeah.  I think you're wrong about that.  So like I said, the whole goal is to get him to be on less of the medications, more equivalent to things – doses of medications and treatments where there is a body of literature of people living, having a more natural life expectancy.

Q:      I see.

A:      So our goals are to help him have a longer, normal life expectancy.  To do that, you have to be continuing to adjust his treatments and improve his treatments.  And you're also assuming that that medicine is stagnant.  I mean, what about new discovery?  What about new treatments?  What about a new drug that might come out that might treat the graft-versus-host disease?  You know what I'm saying?

*Id.* at 27-28.  Finally, Dr. Goodman estimated that, based upon his age, medical history, and treatments, Plaintiff's life expectancy is in the range of ten to twenty years from his transplant.

Dr. Goodman Depo. III, DN 97-3, p. 2.

29

The parties have presented two cases which merit the Court's consideration on the issue of maintenance and cure.  In the first case, the Southern District of Florida held that a shipowner had a continuing obligation to pay maintenance and cure benefits to a seaman even after he was diagnosed with an incurable kidney disease.  *Costa Crociere, S.p.A. v. Rose*, 939 F. Supp. 1538 (S.D. Fla. 1996).  In *Costa Crociere*, a seaman was employed and working aboard the M/V American Adventure when he suddenly became ill and was transferred off the vessel for medical care.  *Id.* at 1540.  He had been previously diagnosed with IgA nephropathy, an incurable kidney disease that could result in total loss of renal function.  *Id.*  The disease is progressive and without dialysis or a kidney transplant, a patient will have total renal failure and die within a matter of weeks.  *Id.* at 1541.  The seaman began receiving dialysis treatment and one of the testifying experts noted that a patient could live on dialysis for ten to twenty years.  *Id.*  The seaman was also eligible for a kidney transplant, which promises "objectively verifiable improvement over a similarly situated patient on chronic dialysis," but does not cure the disease.  *Id.*  The shipowner had provided full maintenance and cure since the seaman was removed from the vessel, but filed a lawsuit for a declaration as to this obligation.  *Id.* at 1545.  The seaman was unable to work or pay for his treatment.  *Id.*

The district court, quoting *Pelotto v. L & N Towing Co.*, 604 F.2d 397, 400 (5th Cir. 1979), noted that "maximum medical improvement is reached 'where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition.'" *Id.* at 1549.  The court then noted that "[t]he record makes plain that appropriate treatment, in the form of dialysis or a transplant, unquestionably will result in a betterment of [the seaman's] medical condition."  *Id.* at 1552.

30

While he would certainly die without treatment, his life with treatment "may be maintained with some degree of normality." *Id.* Thus, the proposed treatment was not merely palliative or directed towards improving his quality of life, but could improve the seaman's condition such that his life would be extended "for an indefinite period of time at a reasonable level of functioning." *Id.* at 1552-53.

The district court then distinguished its case from other cases in which benefits were sought to relieve pain and suffering associated with an incurable ailment or disease. *Id.* at 1553. For instance, the Second Circuit denied maintenance and cure when a syphilitic required periodic treatment in order to prevent relapse, but not cure the disease. *Lindgren v. Shepard*, 108 F.2d 806 (2d Cir. 1940). An epileptic seeking treatment to control his seizures was also denied maintenance and cure. *Stewart v. Waterman S.S. Corp.*, 288 F. Supp. 629 (E.D. La. 1968), *aff'd*, 409 F.2d 1045 (5th Cir. 1969). "In none of these cases did the seaman seek treatment for an incurable ailment or disease that, unless remedied, would result in his almost immediate death." *Costa Crociere*, 939 F. Supp. at 1553. "For this reason, we find these cases unpersuasive on the discrete issue before us, where far more than the alleviation of pain and suffering is at stake and the proposed treatments offer a reasoned prospect of long-term survival." *Id.*

Defendant directs the Court to the case of *Tern Shipholding Corp. v. Rockhill* in which the Northern District of Florida held that a seaman with incurable extensive small cell cancer was not entitled to maintenance and cure benefits. No. 5:04CV381-RS-EMT, 2006 WL 1788507 (N.D. Fla. June 27, 2006). Rockhill was initially diagnosed with limited small cell lung cancer, which is potentially curable and treated with chemotherapy and radiation. *Id.* at *1. It was later confirmed that the cancer had metastasized to the brain and his treatment became hopeful for

remission, but not a cure.  *Id.*  In September of 2003, Rockhill's cancer went into remission and he was permitted to return to work.  *Id.*  In February of 2004, however, Rockhill's disease had returned such that there were increased lesions on the brain or new lesions where there had been none before.  *Id.*  Although Rockhill's employer paid maintenance and cure prior to Rockhill's return to work, they refused to pay maintenance and cure benefits from 2004 onward.  *Id.* at *2.

Citing testimony from Rockhill's doctors, the district court held the employer was not required to pay maintenance and cure after 2003 because "any treatment was and will continue to be for the purpose of controlling his symptoms, reducing his pain and suffering, and improving his quality of life."  *Id.* at *6.  Rockhill's cancer had spread to his brain, which made it unlikely that the cancer would be eradicated.  *Id.* at *5.  The doctors noted that his treatment was palliative and chemotherapy would serve only to delay his likely death from cancer.  *Id.* The district court distinguished *Costa Crociere* by noting the Southern District's emphasis on the fact that the seaman in that case could live in a meaningful manner for an indefinite period of time.  *Id.* at *8.

> The Court does not discount the fact that treatment may extend his life for a period of time, but that issue alone is not enough to justify continued maintenance and cure.  In other words, there is not a reasonable chance, from a medical perspective, that Rockhill will continue to function at a meaningful level with continued treatment.
>
> . . .
>
> Based on the testimony of Rockhill's physicians, treatment will not enhance his bodily function in the sense of permanently controlling or eradicating the illness. Also, while Rockhill may mentally feel better with continued treatment, from a medical standpoint, any improvements in his illness will be temporary at best, and ultimately, will not result in a cure.

*Id.*  In conclusion, although recognizing the "fuzzy boundary" between palliation and betterment,

32

the district court noted that maintenance and cure is not intended to serve as long term disability insurance and the employer was not required to pay benefits beyond 2003. *Id.*

The Court finds that this case is more similar to *Costa Crociere* in regard to Plaintiff's treatment for multiple myeloma. Plaintiff's initial treatment for multiple myeloma was, like the seaman's dialysis, a matter of life and death. Plaintiff's doctors have testified that he would have been dead within a matter of months had treatment been unavailable. In addition, Plaintiff's outlook is similar to the seaman's in *Costa Crociere*. Plaintiff's doctors note that his life expectancy extends to as many as ten to twenty years after his transplant. Plaintiff's condition is incurable, but not terminal. His treatment resulted in remission and he is able to function with some degree of normalcy. Dr. Toor emphasized that long term remissions are possible and Plaintiff is more likely to not have a recurrence than to have one. Finally, the treatment demonstrated marked improvement in the strength of Plaintiff's bones, which had deteriorated due to the cancer. At the very least, Plaintiff has created a genuine issue of material fact that his treatment was more than merely palliative, and summary judgment should be denied.

In addition, it is undisputed that Plaintiff developed GVHD because of his multiple myeloma treatment and that this disease is in fact the likely reason Plaintiff's cancer went into remission. Dr. Goodman noted that Plaintiff's GVHD is likely a permanent, chronic condition. The purpose of the treatment of this disease is to improve his quality of life and extend his life expectancy. Dr. Goodman also believes such treatment has been rendered to improve his physical condition, going beyond palliative treatment. Dr. Goodman testified that Plaintiff's condition continues to improve and he has not yet reached maximum medical improvement. It is unclear to the Court at this time what physical improvements have resulted or are likely to result

33

from Plaintiff's GVHD treatment.  Therefore, the Court finds that a genuine issue of material fact remains as to whether Plaintiff is entitled to recover maintenance and cure for his continued GVHD treatment.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's *Daubert* Motion to Exclude Plaintiff's Experts is DENIED and Defendant's Motion for Summary Judgment is DENIED.